W. E. McLELAND et al., Appellants, v. MARSHALL COUNTY et al., Appellees; ALBERT L. NOLTA et al., Interveners, Appellants.

CONSTITUTIONAL LAW: Legislative Authority—Delegation of Au-
1   thority. The legislature alone must declare what the law shall be; but when it has so done, the vesting of a discretion in administrative

bodies as to how the law shall be executed, does not constitute an unlawful delegation of authority. So held as to the Primary Road Act and the act creating the state highway commission.

CONSTITUTIONAL LAW: Debts of County—Pledge of Credit of State.
2  The credit of the state is not pledged to pay the debts of the various counties of the state, by an act apportioning to said counties, for highway purposes, the money derived from taxes collected by the state on motor vehicles.

CONSTITUTIONAL LAW: General Principles of Construction—Possi-
3  ble Illegal Acts. An act may not be declared unconstitutional be-. cause the administrative bodies in charge of the execution of the act may *assume* to do acts which are illegal.

CONSTITUTIONAL LAW: Due Process—Allotment of Motor Vehicle
4  Fees. The Highway Paving Act, in alloting, for highway purposes, motor vehicle fees to counties in proportion to *area*, does not deprive a citizen of property without due process of law, even though the citizen resides in a county whose allotment is less than the sum total of fees paid in said county. ·

CONSTITUTIONAL LAW: Taking of Private Property—Nonapplica-
5  bility to Power to Tax. The power *to tax* is not limited by the constitutional provision that private property shall not be taken for public use without just compensation.

HIGHWAYS: Highway Paving Act—Resubmission After Adoption of
6  Proposal to Hard-Surface. The statutory provision of the original Hard-surfacing Highway Act that the question of hard-surfacing shall not be submitted to the electors of a county oftener than once in two years, refers solely to a resubmission after the proposition has been once *defeated*. No provision existed in the original act for a resubmission after the proposition had been submitted to the electors and *adopted*.

HIGHWAYS: Bond Election—Notice—Inaccurate Date. Notice of an
7  election to vote on a proposal to authorize a bond issue, which correctly states the date of the election, is not rendered invalid because, inadvertently, the said date is incorrectly stated in a subsequent and superfluous clause of the notice, and complainant *makes no showing of prejudice* because of the inaccuracy.

NOTICE: By Publication—"Once a Week for Two Weeks" Defined.
8  The requirement that a notice of an election shall be published . "once each week for two successive weeks," and so as to leave at least five days prior to such election, requires only the specified number of weekly publications; and the five-day period begins to run from the last publication, *and not seven days thereafter.*

**TIME:** Publication of Notice—Rule of Sufficiency. A statute requiring the publication of a notice "five days prior" to the date of election does not require such a publication as will leave five *clear* days prior to election.

**CONSTITUTIONAL LAW:** Debt Limitation—"Taxable Property" Defined. In determining whether a bond issue of a county for highway purposes exceeds the permissible percentage "on the actual value of the taxable property within such county," *moneys and credits* must be included and added to the actual value of the real and personal property *other than moneys and credits.*

**ELECTIONS:** Voting Machines—Election on Question of Bond Issue. Voting machines may legally be used in voting at a special election on the proposition to issue bonds for highway purposes.

Headnote 1: 12 C. J. p. 847. Headnote 2: 36 Cyc. p. 885. Headnote 3: 12 C. J. p. 787. Headnote 4: 12 C. J. p. 1216 (Anno.) Headnote 5: 12 C. J. p. 1255. Headnote 6: 29 C. J. p. 595. Headnote 7: 15 C. J. p. 620. Headnote 8: 15 C. J. p. 620. Headnote 9: 29 Cyc. p. 1122; 38 Cyc. pp. 322, 323. Headnote 10: 15 C. J. p. 614. Headnote 11: 20 C. J. p. 176 (Anno.)

*Appeal from Marshall District Court.*—JAMES W. WILLETT, Judge.

DECEMBER 18, 1924.

OPINION ON REHEARING APRIL 10, 1925.

ACTION to enjoin the board of supervisors of Marshall County from selling $800,000 of bonds authorized at a special election held on August 14, 1923, and from hard-surfacing the primary road system in Marshall County; and enjoining improvement of any portion of the primary road system in said county. Involved is the right of resubmission to the voters of the county of the question of hard-surfacing, following affirmative action on that proposition at a special election held on July 14, 1919. Also involved is the question of whether the Primary Road Law, Chapter 237 of the Acts of the Thirty-eighth General Assembly, is contrary to certain provisions of the Constitution of the state of Iowa; and also whether said Primary Road Law is contrary to Section 1 of the Fourteenth Amendment to the Constitution of the United States. Other issues are presented.

Facts are set forth in opinion. From decree and judgments denying relief and dismissing petitions, plaintiffs and interveners appeal.—*Affirmed.*

*F. E. Northup, H. C. Lounsberry,* and *Aymer D. Davis,* for appellants.

*C. H. E. Boardman,* for interveners, appellants.

*E. N. Farber* and *Roy L. Pell,* for appellees.

*Ben J. Gibson,* Attorney-general, and *Herbert A. Huff,* Assistant Attorney-general, *Amici Curiae.*

ARTHUR, C. J.—I. There is no substantial dispute in the facts relating to any issue in the case. The questions presented are of law, and call for the interpretation and construction of statutes. The questions are many. To avoid repetition, we shall not here set forth the issues, but will later state the several questions involved, when considering and discussing them.

II. A brief recital of legislation pertaining to roads and proceedings in Marshall County will be helpful. In 1916, Congress passed an act providing for Federal aid to the states in the construction of rural post roads, and appropriated $75,000,000 for that purpose, and provided for furnishing certain amounts thereof during the years 1917, 1918, 1919, 1920, and 1921. Act of July 11, 1916, Chapter 241, 39 Statutes at Large 355. In February, 1919, Congress passed an act amending the act of July, 1916, and appropriating $50,000,000 for the year 1919, making it available immediately; $75,000,000 for the year ending June 30, 1920; and $75,000,000 for the year ending June 30, 1921. In November, 1921, Congress passed an act amending the act of July 11, 1916, and appropriating $75,000,000 for the year ending June 30, 1922. In June, 1922, Congress passed an act for the purpose of carrying out the provisions of the act of July 11, 1916, and appropriated $50,000,000 for the year ending June 30, 1923; $65,000,000 for the year ending June 30, 1924; and $75,000,000 for the year ending June 30, 1925.

In April, 1917, the state of Iowa, by Chapter 249 of the Acts of the Thirty-seventh General Assembly, accepted the proposal of the United States government, as set forth in the act

of Congress of July 11, 1916, and assented to the provisions of the act of Congress. By said act, the state pledged its good faith for the construction and maintenance of rural post roads, and caused to be made available funds sufficient to equal the sum apportioned to the state of Iowa by the United States government. By the provisions of said act, the state funds were provided from the motor vehicle road fund, which was created by funds raised under the provisions of Chapter 2-B, Title VIII, Code Supplement, 1913.

Without repealing Chapter 249 of the Acts of the Thirty-seventh General Assembly, the Iowa legislature enacted Chapter 237 of the Acts of the Thirty-eighth General Assembly, creating primary and secondary road systems, and providing for the primary road fund, which embraced the fund created by Chapter 249 of the Acts of the Thirty-seventh General Assembly, and all additional and further Federal aid road funds, and all funds derived from year to year by the state under acts regulatory of motor vehicles, commencing with and including all fees for the year 1920, with certain exceptions. The highway commission had been previously created by the thirty-fifth general assembly and the thirty-sixth general assembly.

Pursuant to the Federal and state legislation, at an election held in July, 1919, the question of hard-surfacing the primary road system of Marshall County was submitted and carried. At a special election held on August 14, 1923, issuance of bonds in the amount of $800,000, for the purpose of hard-surfacing the primary road system of the county, was authorized.

On September 11, 1923, a petition of electors was filed, requesting that a special election be called for submission of the identical question which was voted on in 1919, namely: "Whether hard-surfacing shall be done on the primary road system, or any portion thereof, in said county of Marshall."

The petition was denied, and this suit was instituted.

III. The constitutionality of the primary road statutes is challenged. We deem it advisable to consider these propositions first. Attacks upon the statutes as to their constitutionality, in substance, are:

(1) They delegate legislative power to the highway commission.

(2)    They pledge the credit of the state to pay the debts of the county, and the state assumes and becomes responsible for the debts of the county.

(3)    The statutes violate the Constitution of the United States and of the state of Iowa, in that they take property without just compensation, or due process of law, and deny to plaintiffs and interveners the equal protection of the law.

Section 2 of Chapter 237 of the Acts of the Thirty-eighth General Assembly reads:

"The state highway commission is empowered, on behalf of the state, to enter into any arrangement or contract with, and required by, the duly constituted Federal authorities, in order to secure the full co-operation of the government of the United States, and the benefit of all present and future Federal allotments in aid of highway construction, reconstruction, improvement or maintenance.    The good faith of the state is hereby pledged to cause to be made available each year, sufficient funds to equal the total of any sums now or hereafter apportioned to the state for road purposes by the United States government for such year and to maintain the roads constructed with said funds. The board of supervisors of each county is empowered to enter into any arrangement or contract with, and required by, the state highway commission, in order to fully carry into effect the provisions of this act."

Further defining the duties of the commission, Section 1527-s2, Code Supplemental Supplement, 1915, reads:

"The duties of said commission shall be:

"1.    To devise and adopt plans of highway construction and maintenance suited to the needs of the different counties of the state, and furnish standard plans to the counties in accordance therewith.

"2.    To disseminate information and instruction to county supervisors and other highway officers, answer inquiries and advise such supervisors and officers on questions pertaining to highway improvements, construction and maintenance and of reasonable prices for materials and construction.

"3.    To keep a record of all important operations of the highway commission, and to annually report the same to the governor by the first day of January, which report shall be

printed as a public document; but the summary report of the county highway engineers shall be reported not later than February first.

"4.  To appoint such assistants as are necessary to carry on the work of the commission, define the duties and fix the compensation of each, and terminate at will the terms of employment of all employees, provide for necessary bonds, and fix the amount of same.

"5.  To make investigation as to conditions in any county, and to report any violation of duty, either of commission or omission, to the attorney-general, who shall take such steps as are deemed advisable by him to correct the same.

"6.  The state highway commission shall have general supervision of the various county and township officers named in this act in the performance of the duties here enjoined, and shall have full power and authority to enforce the provisions of this act.

"7.  To make surveys, plans and estimates of cost for the elimination of danger at railroad crossings on highways and streets, and to confer with local officials, railroad officials and the Iowa railroad commission in the elimination of such dangers at railroad crossings.

"8.  The state highway commission shall assist the county board of supervisors and the attorney-general in the defense of patent suits relative to road or bridge construction, make surveys for the state board of control when so requested, and perform all other duties required by law."

It may be conceded, as contended by appellants, that the highway commission is an administrative body only, and cannot properly exercise legislative power.  The inquiry is, then, do the statutes in question attempt to confer legislative power upon the commission?  We think, upon careful examination and analysis of the statutes in question, that they do not lend support to the position of appellants that they confer legislative duties and power upon the commission.  The exact line of demarcation between legislative power and administrative duties, in some cases, is not easily determinable.  It may be stated in a general way that it is for the legislature to determine what

1. CONSTITUTIONAL
   LAW: legislative
   authority: dele-
   gation of au-
   thority.

the law shall be, to create rights and duties and provide a rule of conduct. This does not necessarily mean that the legislature must lay down a strict rule that must be followed by an administrative officer; but that an executive or commission may be vested by the legislative branch of the government with discretion, within certain limits, in carrying out the provisions of a statute.

In *Alton & Southern Railroad v. Vandalia R. Co.*, 268 Ill. 68, in discussing whether the power granted to the public utilities commission was legislative in character, the Illinois court said:

"While the legislature cannot delegate its power to make a law, it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. (*Fish v. McGann*, 205 Ill. 179.) To hold that whatever the legislature may do, it shall do in every detail, or else the thing shall go undone, would be to practically destroy government. Necessarily, regarding many things, especially affecting local or individual interests, the legislature may act either mediately or immediately. While the legislature cannot divest itself of its proper function or delegate its legislative authority, it may still designate others to do those things which it can appropriately, yet cannot understandingly or advantageously, do itself."

In *Mitchell v. Lowden*, 288 Ill. 327, in discussing the question as to whether a statute delegated legislative powers to the department of public works and buildings, a body similar to our highway commission, the Illinois court said:

"There is no delegation of either legislative or judicial power to the department of public works and buildings. It is true that many questions,—the material to be used, the width of the roadways, the character of the construction and the plans and specifications therefor, the terms and conditions of contracts, the acceptance or rejection of work done, and the numberless details in carrying out the provisions of the act,—are left to the determination of the department of public works and buildings, which is authorized and required to make all final decisions. The decision of such questions is ministerial."

Upon this point also see *Hildreth v. Crawford*, 65 Iowa 339;

*State v. Miller,* 146 Iowa 521; *Hubbell v. Higgins,* 148 Iowa 36; *Lloyd v. Ramsay,* 192 Iowa 103; *United States v. Grimaud,* 220 U. S. 506.

The rule is well stated in *Buttfield v. Stranahan,* 192 U. S. 470 (48 L. Ed. 525). Among other things, the court said:

"We may say of the legislation in this case, as was said of the legislation considered in Marshall Field & Co. v. Clark, that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted."

It is said in 1 Sutherland on Statutory Construction, Section 88:

"The true distinction is between the delegation of power to make the law, which involves a discretion as to what the law shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter, no valid objection can be made."

IV. It is complained that the statutes pledge the credit of the state to pay the debts of the county, and that the state assumes and becomes responsible for the debts of the county. We take it that the particular complaint is aimed at Section 4 of Chapter 237 of the Acts of the Thirty-eighth General Assembly, which reads:

2. CONSTITUTIONAL LAW: municipal debts: pledge of credit of state.

"There is hereby created a fund which shall be known as the primary road fund, which shall embrace the Federal-county-co-operation road fund as created by Chapter 249 of the Laws of the Thirty-seventh General Assembly, all additional and future Federal aid road funds, and all other funds derived from year to year by the state under acts regulatory of motor vehicles, commencing with and including all fees for the year 1920, except such portion of said motor vehicle fund as shall be necessary to maintain the Federal aid engineering fund, and as may, by law,

be retained in the state treasury as a maintenance fund for the state highway commission, or as a fund to cover administration of the motor vehicle department. Said primary road fund shall be apportioned to the respective counties in the ratio that the area of the county bears to the total area of the state, and shall be employed as herein provided, solely in the drainage, grading, surfacing and maintenance of the roads of the primary road system, except as hereinafter provided. The portion of said fund apportioned to each county as above provided, is hereby pledged to the completion of said primary system and is dedicated by the state to the county, to be used solely for the payment of the cost of such improvements or the maintenance thereof, and for the redemption of any bonds issued therefor as herein provided. For the purposes of administration, the apportionment to any county may be made up partly from the Federal aid road allotments.''

It will be observed that the portion of the primary road fund which the state provides is derived from taxes collected by the state on account of motor vehicles. The debts for road purposes are created by the counties, and the state provides in part for the payment of them by appropriating motor vehicle funds. The commission appropriates no fund, and merely acts as an agency through which disbursements are handled. The motor vehicle fund is created by legislative authority of the state, and undoubtedly the disposition of it is within the power of the state legislature. By the statute, the legislature has appropriated these funds for the improvement of the state highways, over which the legislature has absolute control. The commission is merely an agency by which the legislature carries out the provisions of its acts. We think that in no sense do the statutes pledge the credit of the state to any county, nor does the state become responsible for the bonded indebtedness of any county. Under the statutes, the state apportions to the several counties the portion of the primary road fund which each county is entitled to. By the motor vehicle fund, by a millage tax, and by assessment against abutting property, the counties pay for the highway improvements, and pay bonds issued to provide funds for the making of such improvements. We think that the pro-

visions of the statutes complained of in no way violate any provisions of our state Constitution.

V. Appellants insist that the primary road statutes violate the Constitution of the United States and the Constitution of the state of Iowa, in that they attempt to confer upon the boards of supervisors and the highway commission powers that are *ultra vires;* that they take property without due process of law, and deny equal protection of the law. Articles V and XIV of the Amendments to the Federal Constitution read:

3. CONSTITUTIONAL LAW: general principles of construction: possible illegal acts.

"Article V. No person shall * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

"Article XIV, Section 1. * * * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Sections 9 and 18 of Article 1 and Section 1 of Article 7 of the Constitution of Iowa read:

"Section 9. * * * No person shall be deprived of life, liberty, or property, without due process of law."

"Sec. 18. Private property shall not be taken for public use without just compensation first being made, or secured to be made, to the owner thereof * * *."

"Sec. 1, Art. 7. The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation; and the state shall never assume, or become responsible for the debts or liabilities of any individual, association, or corporation, unless incurred in time of war for the benefit of the state."

In *City of Beatrice v. Wright,* 72 Neb. 689 (101 N. W. 1039), in discussing the constitutionality of a statute, the Nebraska court tritely said:

"The vital point to be determined is, what is authorized to be done? The constitutional validity of the law is to be tested, not by what possibly has been or may be done under it, but by what can * * * be done under and by virtue of its provisions."

If action of officials whose duties are to execute and carry out the provisions of law,—carry it into effect,—should be *ultra vires*, that is no fault in the law; and ample remedy exists for such illegal conduct. It is pertinent to add that it will be presumed that officers will not act beyond their power and duties, as defined by law. *State v. Miller*, 146 Iowa 521.

Appellants contend that the provision of Section 2, Chapter 237, of the Acts of the Thirty-eighth General Assembly, that "the board of supervisors of each county is empowered to enter into any arrangement or contract with, and required by, the state highway commission, in order to fully carry into effect the provisions of this act," confers upon the board of supervisors and highway commission *ultra vires* power, because no tax is levied or provided to carry out the object stated. The criticism is not justified. The statute does create a primary road fund, made up of Federal aid allotments and motor vehicle license fees, for the purpose of paying the cost of road improvements. Section 27 of the act also provides:

"If a majority of the voters be in favor of such bond issue and tax levy, the board of supervisors shall, each year thereafter during the life of the bonds, levy on all the property of the county such part of such authorized tax as will clearly meet (1) the matured or maturing interest for the ensuing year on all such outstanding bonds, and (2) any amount of maturing principal of bonds, provided, however, that only so much of said tax shall be levied in any year for principal of said bonds, if any, as cannot be met (a) by the county's allotment of the primary road fund available for such ensuing year, and (b) by the proceeds of special assessments on benefited property."

VI. Specific complaint is made that the act violates the Federal and state Constitutions, because, under the act, motor vehicle license fees imposed upon motor vehicles in Marshall County, and paid to the treasurer of state, are not all returned to Marshall County, but portions thereof are distributed to other counties of the state which have more area and a smaller number of automobiles. A party is not deprived of his property without due process of law by the enforced collection of taxes merely because, in individual cases, it works hardships or im-

4. CONSTITUTIONAL LAW: due process: allotment of motor vehicle fees.

poses unequal burdens. *Kelly v. Pittsburg*, 104 U. S. 78. If a tax is for a public purpose, as distinguished from a private purpose, it will be upheld by the courts, and will not amount to the taking of private property without due process of law. *Green v. Frazier*, 253 U. S. 233; *Jones v. City of Portland*, 245 U. S. 217. That the construction and maintenance of public roads and highways constitute a public purpose, within the meaning of the law, requires no citation of authority. The motor vehicle license fees are raised for the improvement of the highways, and are, therefore, raised for a public purpose.

In *Knights v. Jackson*, 260 U. S. 12 (67 L. Ed. 102), where there was involved the validity of a statute providing that certain funds raised by the state should be distributed to cities and towns, to be expended for various public purposes, very much like the distribution of automobile fees under the act before us, the Supreme Court, in discussing that question, said:

"In Massachusetts, taxes of a kind that used to be imposed by the cities and towns now are imposed and collected by the commonwealth, and afterwards distributed to the cities and towns, to be expended for various public purposes. In this way are collected and distributed, with necessary exceptions, taxes upon the interest from debts, dividends from stock and from partnerships, * * * and upon the excess over $2,000 per annum of income derived from professions and business, again with necessary exceptions, * * * the treasurer and receiver general is directed to set aside and pay over to the cities and towns from the proceeds of the income tax a sum sufficient to reimburse them for specified increases of salaries of school-teachers, supervisors, superintendents, and the like."

It will be observed that the Massachusetts law did not provide for the distribution to a city or town of the *exact* amount of the income tax that was paid in said city or town, but only of a sufficient amount to reimburse each city or town for the amount of the specified increase of salaries of school-teachers, etc. In this respect, the Massachusetts statute was similar to the statute under consideration. It was held by the Supreme Court, speaking through Mr. Justice Holmes, that the Massachusetts statute did not involve the taking of the property of the taxpayers without due process of law.

Appellants' argument, under Section 18, Article 1, of our state Constitution, above quoted, providing that "private property shall not be taken for public use without just compensation," etc., is answered in *Warren v. Henly*, 31 Iowa 31, where we said:

5. CONSTITUTIONAL LAW: taking of private property: nonapplicability to power to tax.

"It is argued that the taxation is prohibited by Article 1, Section 18, of the Constitution. This provision, which prohibits the taking of private property for public use without just compensation therefor, is applicable to cases where property is taken under the exercise of eminent domain, and does not limit the taxing power."

In the same case, our court, speaking through Mr. Justice Beck, said:

"I know of no restrictions upon the power of taxation, except these two: 1. Taxes must be for objects that are public in their nature. It is admitted on all hands that the paving of a street is a public object. 2. They must be uniform. By this I understand that they must not be imposed alone, nor unequally, upon particular individuals or classes. This rule, however, I understand, is applicable generally to the *principle* or *plan* of taxation, and not to specific or particular taxes. * * * The rule means that all individuals and all classes must contribute uniformly with like individuals and like classes to the burden of taxation. The manner of imposing this burden must, of necessity, be left to the discretion of the legislative branch of the government. That a tax or a system of taxation may not bear equally upon all, when weighed in the nicest balance of equity and justice, is no reason for holding that it conflicts with the fundamental and essential rule under consideration. Such a result is inevitable from the nature of things; for it is practically impossible so to form a system of taxation that all will equally bear the burden imposed. * * * In my opinion, in the exercise of the power of taxation, the special participation in the benefits of a particular tax, on the part of the taxpayer, has nothing to do with the right to impose the tax. A special tax may go into the treasury for the general purpose of the government levying it. The identical revenue thus collected may be used for purposes from which the taxpayers of whom it was

received derive directly no benefit, and others, paying not one cent of the special tax, are solely benefited in its disbursement.''

We think the provisions of the statute complained of not wanting in due process of law.

VII.   On July 14, 1919, the question of hard-surfacing the primary roads of Marshall County was submitted to the voters at a special election, and it was affirmatively determined at said

6. HIGHWAYS: Highway .Paving Act: resubmission after adoption of proposal to hardsurface.

election by a majority vote that said roads should be hard-surfaced.   Pursuant to said election, the. board proceeded under the plan that the roads should be hard-surfaced.   Practically all of the primary road system in the county was graded, and bridges and culverts installed, and the roads thereby made ready for hard-surfacing; and about six miles of the primary road system were hard-surfaced.   At a special election held on August 14, 1923, by a decisive vote there was authorized the issuance of bonds in the amount of $800,000, for the purpose of hard-surfacing the primary road system in the county.

On September 11, 1923, a petition was filed in the office of the county auditor, in form as follows:

''We, the undersigned electors of Marshall County, Iowa, do hereby petition the honorable board of supervisors of Marshall County, Iowa, to call a special election of the qualified electors of said county and to submit at said election to the qualified electors thereof the question: 'Whether hard-surfacing shall be done on the primary road system, or any portion thereof, in said county of Marshall.' ''

We will assume, at this point, that the petition was in proper form, and signed by the requisite number of qualified electors of Marshall County.   On October 5, 1923, the board took action on the petition as follows:

''The board of supervisors again considered the petition of A. L. White, et al., filed with the county auditor on September 11, 1923, and found that inasmuch as the question of hard-surfacing the road system of the county heretofore had been determined, and the question of issuing bonds therefor had been favorably acted upon, there is no statutory authority for calling or having the special election asked for by the petitioners.''

The petitions of appellants prayed that a peremptory order of mandamus issue, directed to the board of supervisors, commanding that the board call a special election for the purpose of submitting to the electors the question of "whether hard-surfacing shall be done on the primary road system, or any portion thereof, in said county of Marshall," as prayed in the petition of electors filed September 11, 1923. The position of the board, in denying the petition, which is the position of appellees on this appeal, is stated in the resolution of October 5, 1923, that:

"Inasmuch as the question of hard-surfacing the road system of the county heretofore has been determined, and the question of issuing bonds therefor has been favorably acted on, there is no statutory authority for calling or having the special election asked for by the petitioners."

Without considering here whether mandamus or certiorari, or either, affords the proper remedy, which is elaborately discussed by counsel in their briefs, does the right exist, under the record in this case, and the statutes, to have the special election petitioned for, and to have submitted thereat the proposition of "whether hard-surfacing shall be done on the primary road system, or any portion thereof, in said county of Marshall?" The solution of this question involves construction and interpretation of the statutes, under the facts of what occurred.

The concrete question is: After the vote in favor of hard-surfacing in 1919, and an authorization of bonds at the election in 1923, was the matter of hard-surfacing closed, and could it be again submitted to a vote, as prayed for in the petition filed September 11, 1923? That is, could the proposition of hard-surfacing be again submitted to a vote? The primary road law, Chapter 237 of the Acts of the Thirty-eighth General Assembly, says nothing directly either way on this proposition. It contains no provision for again submitting or resubmitting the question of hard-surfacing. The act states that the supervisors shall not proceed with hard-surfacing until authorized by vote of the people, and provides for petitioning for such election, and provides further that the question of hard-surfacing shall not be submitted to a vote in any county oftener than once every 24 months. Beyond this, the act is silent. The act provides that:

"The question as to hard-surfacing the roads and as to issue of bonds under this act may be submitted at the same election."

The next sentence also provides for submission of the two questions, hard-surfacing and the issuance of bonds, reading:

"And at the election as to whether or not bonds may be issued, there may be submitted at the same election and upon the same ballot as a separate proposition the question of whether or not hard-surfacing may be done."

Both sentences are concerning the same matter. The first sentence says that both questions may be submitted at the same election. The second sentence also states that the two questions may be submitted at the same election, and upon the same ballot, but provides further that the question of hard-surfacing may be submitted "as a separate proposition." The act further provides:

"If upon such submission the proposition of hard-surfacing is defeated, such vote shall thereby nullify the vote as to the issuance of bonds." Section 6, Chapter 237, Acts of the Thirty-eighth General Assembly.

This last sentence unquestionably refers to when both propositions are submitted at the same election. We fail to find in the act any right for resubmission of the question of hard-surfacing, under the record in this case, hard-surfacing having been voted on in 1919, and bonds for hard-surfacing having been voted on in August, 1923, and both propositions having carried.

During the session of the thirty-eighth general assembly, while the primary road act was under consideration, on its passage it was sought to amend the act, so as to permit "voters, if hard-surfacing carried, might, by petitioning the election, abandon the option provided for by the act."

Again in the thirty-ninth general assembly, it was sought to amend the act by adding to Section 6 thereof the following:

"Any county which has voted to hard-surface its primary roads may in like manner as hereinafter provided hold an election to vote whether hard-surfacing of its roads shall be discontinued."

In the fortieth general assembly it was sought to amend the act by adding to said Section 6 of the act the same provision as

contained in the amendment offered in the thirty-ninth general assembly. All of these amendments failed of passage. Appellees claim for the offering of these amendments and their failure of passage, the legislative declaration that the law as originally enacted did not permit the resubmission of the question of hard-surfacing where there had been a favorable vote thereon. We cannot accord to the efforts to amend the act and their failure of passage the probative value claimed by counsel for appellees. However, they may be, and we think they are, of some significance, and indicate in some degree that the legislature thought that the act did not provide for resubmission of the question of hard-surfacing when that question had been voted on and carried. Of greater importance, and more persuasive that the act does not provide the right to resubmit the question of hard-surfacing after the proposition has been favorably voted on, we think, is Section 50-a1 of Chapter 25 of the Acts of the Extra Session of the Fortieth General Assembly, which reads:

"Any authorization, voted by the electors, and not acted upon by the letting of contracts for hard-surfacing within four years after said authorization, or if contracts have been let thereunder and four years have elapsed since the letting of the last contract, may be canceled in the following manner: A proposition for such cancellation must be submitted by the board of supervisors upon petition of ten per cent of the voters as provided upon the submission of the original proposition for authorization, and all the proceedings as to notice and holding such election shall be the same as upon such original submission so far as practicable."

We fail to find in Chapter 237 of the Acts of the Thirty-eighth General Assembly any provision for resubmission of the question of hard-surfacing after the question has been voted upon favorably. All of the provisions of said act for submission on the question, we think, were intended to apply where authority to hard-surface had not been voted. If the legislature had intended Section 6 of the act to give the right to resubmit, it would undoubtedly have used the term "resubmit," or a term of like effect, rather than "submit," which is the term used in that section. The only provision anywhere found, authorizing resubmission of the proposition of hard-surfacing, is the section

above quoted, enacted by the fortieth general assembly.

Appellants also rely upon Sections 446 to 452, Code of 1897, as giving them the right to resubmission of the question of hard-surfacing. These sections have to do with matters not in any way connected with primary roads. The primary road law relates to a general plan of improvement of all highways in the state; and we think said sections not applicable in the instant case. We reach the conclusion that, under the record in this case, no right existed for resubmission of the question of hard-surfacing.

VIII. It is argued that the notice of the special election of August 14, 1923, the bond election, was not published as required by law. The provision for notice appears in Section 25 of Chapter 237, and reads:

"Notice of such election shall be given by publication once each week for two successive weeks in all the official newspapers of the county, stating the time when such election will be held, and substantially the proposition that will be submitted. The last publication to be at least five days prior to the day such election is to be held."

The notice of the special election was published in the Gilman Dispatch, the State Center Enterprise, weekly papers, and the Marshalltown Times-Republican, a daily paper, the three official papers of the county. The publications of the notice in the two weekly papers were on July 26 and August 2, 1923. The notice was published in the Marshalltown Times-Republican in three issues: namely, on July 26, August 2, and August 9, 1923.

7. HIGHWAYS: bond election: notice: inaccurate date.

It is insisted by appellants that the notice published in the Times-Republican on July 26th was defective, rendering it invalid, in that it fixed the election on "August 14, 1924." This contention is erroneous. The first paragraph of that notice states:

"Notice is hereby given that an election by the qualified electors of Marshall County, Iowa, will be held in the several precincts in said county on August 14, 1923."

Immediately following the above-quoted portion of the notice, were stated the question to be submitted to the voters, instructions as to voting, a copy of the ballot that would be

used, and a statement of time the polls would be open; and then appeared, toward the end of the notice, the following sentence:

"All persons qualified to vote at a general election as provided by law, shall be deemed qualified to vote at said election on August 14, 1924."

Manifestly, printing *1924* instead of *1923* was a typographical error. The sentence was surplusage, because said statement is not required by law to be in the notice. It is clearly stated in the opening paragraph of the notice that the election would be held on August 14, *1923*. We think that the typographical error above mentioned did not render the notice invalid. At most, it was merely an irregularity. It is not a case of no notice. In such a case, prejudice must be shown, in order to defeat an election. There is no showing in this case that any elector was deceived or misled by the erroneous date, 1924, and thereby refrained from voting at the election held on August 14, 1923. This question, in principle, has been before us in several cases, and settled against the contention of appellants. *Dishon v. Smith*, 10 Iowa 212; *Page County v. American Emigrant Co.*, 41 Iowa 115; *Lehigh Sewer P. & T. Co. v. Town of Lehigh*, 156 Iowa 386; *Younker v. Susong*, 173 Iowa 663; *McDunn v. Roundy*, 191 Iowa 976. See, also, cases from other jurisdictions: *Garden City G. & N. R. Co. v. Board of County Com. of Scott County*, 82 Kan. 795 (109 Pac. 684); *North v. McMahon*, 26 Okla. 502 (110 Pac. 1115).

Since we hold, as we do, that the publication in the Times-Republican on July 26th was a valid publication of the notice, the notice was published in the three official newspapers of the county on July 26th and August 2d. Thus, 18 clear days intervened between July 26th, the first publication, and August 14th, election day, and 11 clear days between the second publication, on August 2d, and the date of election. It is the contention of appellants that:

8. Notice: by publication: "once a week for two weeks" defined.

"The two publications required by the statute must cover a period of 2 weeks, and that 5 days must intervene between the last publication and the election. That once each week for a period of 2 successive weeks means a period of 14 days from the first publication, before the 5-day period begins. That a

period of 14 days or 2 consecutive weeks plus 5 days must intervene between the first publication and the election."

Counsel for appellants ably argue their proposition, and cite authorities from other jurisdictions which fairly support their contention. Other authorities from foreign jurisdictions are cited by appellees, holding to the contrary. We think that, according to the weight of authority, a provision that a publication shall be made once a week for a specified number of weeks, as in the statute before us, requires only the specified number of weekly publications; and that the five-day period begins to run at the completion of the last publication, and not seven days thereafter.

Whatever may be the holdings of other courts, the question is settled in this state against the contention of appellants, in the cases of *Morrow v. Weed*, 4 Iowa 77; *Banta v. Wood*, 32 Iowa 469.

We reach the conclusion that all of the requirements of the statute were complied with in the publication of the notice, without regard to the publication in the Times-Republican on the 9th of August. However, the publications in the Times-Republican on the 2d and 9th of August were sufficient, we think, without regard to the publication on July 26th.

Appellants contend that, in any event, five *clear* days must have intervened between the date of the last publication and election day. Section 48, Paragraph 23, Code of 1897, provides:

9. Time: publication of notice: rule of sufficiency. "In computing time, the first day shall be excluded and the last included, unless the last falls on Sunday, in which case the time prescribed shall be extended so as to include the whole of the following Monday."

The election day, August 14th, did not fall on Sunday or Monday. It is also the general rule, in the absence of statute, in computing time for the publication of notices, not to reckon the first and last days, inclusive, but to include one and exclude the other. 29 Cyc. 1122.

IX. Appellants say that the authorization of the bond issue at the election of August 14, 1923, is void because it exceeded the legal limit of indebtedness for the county. The principal

10. Constitu-
tional law:
debt limitation:
"taxable prop-
erty" defined.

claim is that moneys and credits should not be included when determining the actual value of the taxable property within the county. There is no dispute as to the indebtedness of the county at the time of the election, and the assessed value of real and personal property, exclusive of moneys and credits, and includ- ing moneys and credits. It is unnecessary to set forth the amounts of the valuations of property and the indebtedness. It is conceded that, if moneys and credits of the county be in-. cluded in determining the actual value of the taxable property, the legal limit of indebtedness will not be exceeded by the bond issue. Section 43 of the act reads:

"The amount of bonds issued under this act by any county shall not, when added to all other indebtedness of the county, exceed in the aggregate three per cent on the actual value of the taxable property within such county, any other statute to the contrary notwithstanding—to be ascertained by the last state and county tax list previous to the incurring of such in- debtedness."

The proposition that moneys and credits cannot be consid- ered as taxable property, within the meaning of Section 43 of the act, which must govern in this case, we think is not correct. The statutory provision for assessment of moneys and credits appears in Section 1310, Code Supplement, 1913, and contains the provision:

"The millage tax here provided for shall be in lieu of all other taxes upon moneys and credits and shall be levied by the board of supervisors, placed upon the tax list and collected by the county treasurer, and the amount collected in the various taxing districts of the state shall be divided between the various funds upon the same pro-rata basis as other taxes collected in such taxing district are apportioned."

It will be observed that the millage tax provided for *shall be placed upon the tax list* and collected by the county treasurer. We think that the provision above quoted, requiring levy on moneys and credits to be placed upon the tax list, brings the same squarely within the provision of Section 43 of the act, and that moneys and credits are to be included when determining

the value of taxable property within the county. Code Section 48, Subdivision 10, reads:

"The word 'property' includes personal and real property."

In *Miller v. City of Glenwood,* 188 Iowa 514, we had before us the question of limitation of debt, under Article 11, Section 3, of the state Constitution, reading:

"No county, or other political or municipal corporation shall be allowed to become indebted in any manner, or for any purpose, to an amount in the aggregate, exceeding five per centum on the *value of the taxable property* within such county or corporation—to be ascertained by the last state and county *tax lists,* previous to the incurring of such indebtedness."

The italicization, of course, is ours. In the *Miller* case, we said:

"Section 48 of the Code of 1897, Subdivision 10, provides that the word 'property' includes personal and real property. It follows, therefore, that, when this constitutional provision says that a city cannot become indebted in any manner, for any purpose, to an amount in the aggregate exceeding five per centum of the value of the taxable property, it included in the words 'taxable property' both real and personal property, subject to taxation within the city."

We think that the term "taxable property within such county," used in the act under consideration, must mean the same as the term "taxable property" used in the Constitution.

X. At the bond election, held on August 14, 1923, voting machines were used in all of the precincts throughout the county. It is the claim of appellants that the statute under which the election was held does not contemplate the use of voting machines; that the statute requires a written ballot; and that this requirement was violated by the use of the voting machines, rendering the election void. Section 25 of Chapter 237 of the Acts of the Thirty-eighth General Assembly provides that the proposition of issuing bonds may be voted on at a general or special election; and that special elections shall be conducted in the same manner as general elections are conducted.

11. ELECTIONS: voting machines: election on question of bond issue.

Section 1106, Code Supplement, 1913, as amended, provides for the form of the ballot, and how the voter shall mark

his ballot. Substantially the same provisions in regard to voting by ballot are contained in said Section 25. There is nothing in Section 25 to indicate that an exception is to be made in the election there provided for, in the matter of using voting machines.

Section 1137-a7, Code Supplement, 1913, reads:

"That at all state, county, city, town, primary and township elections hereafter held in the state of Iowa, ballots or votes may be cast, registered, recorded, and counted by means of voting machines, as hereinafter provided."

In the case of *Voting Machine Co. v. Hobson*, 132 Iowa 38, we held that the statutes authorizing the use of voting machines are not in violation of the Constitution, which declares that "All elections by the people shall be by ballot."

The use of voting machines being authorized by statute at general elections, and the act under consideration providing that the bond election may be either at a general or special election, and that a special election shall be conducted in the same manner as a general election, we think it must follow that special elections under this act permit the use of voting machines.

Other issues which arose in the trial of the case below, and which are presented on this appeal, but not strongly pressed, are: That the board acted illegally in canvassing the returns of the election; that the election was void because the canvass of the vote was not completed until six days after the election; that the proceedings of the board were not published until November 26th succeeding the election; that the board was partisan in the election, and misled the voters into voting affirmatively upon the proposition submitted. We do not deem it necessary to discuss these propositions. We have carefully examined the record, briefs, and arguments of counsel dealing with each and all of these questions, and conclude that the contentions of appellants with respect to them are without merit.

We reach the conclusion that appellants are not entitled to injunctive remedy prayed, nor to mandamus directing the board to resubmit the question of hard-surfacing the roads; that, under the record, there exists no right for resubmission of the question of hard-surfacing; that the Primary Road Law does not con-

travene provisions of the Constitution of Iowa, nor the Federal Constitution.

Upon careful consideration of the whole record and all of the questions presented, we reach the conclusion that the decree of the court below should be, and it is hereby, affirmed.— *Affirmed.*

Evans, Preston, Stevens, Faville, De Graff, and Vermilion, JJ., concur.