THE ALTON AND SOUTHERN RAILROAD, Appellee, *vs.* THE
VANDALIA RAILROAD COMPANY, Appellant.

*Opinion filed April 22, 1915.*

1. STATUTES—*what is meant by construing a statute strictly.*
Construing a statute strictly means simply that the statute should
be confined to such subjects or applications as are obviously with-
in its terms and purposes.

2. SAME—*intention of the legislature is what is to be deter-
mined.* The intention of the legislature is to be gathered from
the necessity or reason of the enactment, with the meaning of the
words enlarged or restricted according to their real intent; and
in determining the meaning of a statute the courts will keep in
mind the circumstances surrounding its enactment and the objects
sought to be attained.

3. RAILROADS—*the Public Utilities Commission has power to
require grade of old road to be raised.* The Public Utilities Com-
mission has all the powers formerly possessed by the Railroad and
Warehouse Commission and also enlarged powers conferred by
section 58 of the Public Utilities act, and in granting an applica-
tion for the crossing of one railroad by another it has power to
require the raising of the grade of the old railroad.

4. SAME—*present condition of the law as to railroads crossing
each other at grade.* Under the law as it now exists, where one
railroad desires to cross another at grade, damages must be paid,
as before, by the petitioning company, but the plans and specifica-
tions for such crossing must be submitted to and approved by the
Public Utilities Commission before compensation can be ascer-
tained in eminent domain proceedings, and also must be so sub-
mitted and approved by such commission before a grade crossing
can be put in by agreement of the railroads affected.

5. SAME—*Public Utilities Commission has full power over the
crossing of railroads.* The Public Utilities Commission has full
power and authority over the method, manner and mode of grade
or elevated crossings of steam railroads as well as other railroads
and public highways, and to fix the location and prescribe the
conditions as to the physical construction and arrangement of the
crossing, including the elevation or depression of the grade of any
existing railroad, if that is the most reasonable method of con-
structing the crossing.

6. SAME—*one railroad company cannot take property of an-
other without compensation.* Before a railroad company can take
the property of another for a crossing it must either agree with

the other as to the damages for the crossing, or must in eminent domain proceedings settle the amount of compensation it is legally required to pay for taking the crossing under the proposed plan.

7. SAME—*legislature has not intended to abolish grade crossings of railroads.* In passing the Crossings act of 1907, and other statutes, it has not been the intention of the legislature to entirely abolish the crossing of one railroad by another at grade, but only to prevent such crossings as needlessly or uselessly impede or endanger travel or transportation on the railroads crossed.

8. SAME—*the question whether there shall be a grade crossing rests with Public Utilities Commission.* The authority to decide whether or not there shall be a grade crossing of one railroad by another at a given point rests with the Public Utilities Commission, and its decision on such question will not be set aside by the courts if it is supported by the weight of the testimony.

APPEAL from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

FORDYCE, HOLLIDAY & WHITE, and MCANULTY, ALLEN & HUMPHREY, for appellant.

JOHN L. FLANNIGAN, and MARTIN W. SCHAEFER, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a proceeding brought by the appellee, the Alton and Southern Railroad, before the Public Utilities Commission of this State, praying that said railroad might be granted the right by said commission to cross the tracks of the appellant, the Vandalia Railroad Company. About the same time the appellee filed a petition before the commission praying for the right to cross the Baltimore and Ohio Southwestern railroad close to the point where the appellee desired to cross said Vandalia railroad, both crossings to be at grade. Said Vandalia Railroad Company and said Baltimore and Ohio Southwestern Railroad Company answered, stating, among other things, that the said grade crossings would be dangerous and cause irreparable damage to them. After a hearing before the commission the prayer

of the appellee was allowed and an order entered by said Public Utilities Commission setting out certain conditions, some of which will be hereinafter more specifically referred to. From that order both of said respondent railroad companies appealed to the circuit court of Sangamon county, which entered judgment affirming the decision of the Public Utilities Commission. The Vandalia Railroad Company thereupon appealed from that order to this court. The proceedings against said Vandalia Railroad Company and said Baltimore and Ohio Southwestern Railroad Company were consolidated for a hearing before the Public Utilities Commission, also in the circuit court of Sangamon county. The Vandalia Railroad Company, however, is the only appellant here.

The Vandalia and the Baltimore and Ohio Southwestern Railroad Companies enter the city of East St. Louis, Illinois, from the east. From the bluffs lying east of that city to the Mississippi river the land is generally level. Said two railroads, in running across this low land, for a portion of the distance are nearly parallel. Appellee, the Alton and Southern Railroad, desired to cross the tracks of these two roads at points on their lines near the eastern limits of their respective yards in East St. Louis. At this locality the Baltimore and Ohio Southwestern Railroad Company has one track and is on the southerly side of the double track of the Vandalia railroad, the distance from the center of the one right of way to the center of the other right of way being about 120 feet. The Baltimore and Ohio Southwestern track at that place is on an embankment about six feet in height and that of the Vandalia Railroad Company on one about two feet lower. Appellee, the Alton and Southern Railroad, by the terms of its charter is authorized to construct a railroad from a point on the easterly bank of the Mississippi river, in an easterly and northeasterly direction, to a point in St. Clair county, Illinois, near the northeasterly limits of East St. Louis. This

railroad is at the present time partially constructed, and
is located in a more or less semi-circular form from two
to five miles from the center of East St. Louis, bordering
that city on its southerly and easterly sides, and crosses at
grade the railroads which radiate from the city south and
east.   Its tracks at the time of this hearing were located
and practically constructed up to the tracks of appellant's
railroad.   The evidence shows that appellee's railroad is
being constructed as a belt line, to do a freight transfer
business with the other railroads entering East St. Louis.
The evidence also tends to show that the Terminal As-
sociation of East St. Louis is composed of fourteen or
fifteen railroads or trunk lines which enter East St. Louis
and St. Louis, owning three belt lines on the east side
of the river that are engaged in transferring trains and
cars to and from the various railroads that center in East
St. Louis.   The first belt line is on the river front, and is
called the East St. Louis Connecting Railroad; the second,
at Eighteenth street, is known as the Venice and Caron-
delet Belt Line; the third is one block further east, and
is known as the Illinois Transfer Belt Line.   The cross-
ings of these three belt lines in East St. Louis are all at
grade.   The appellee, in the process of construction from
the west and south to the present point, has constructed
grade crossings across all the railroads, steam or electric,
which it intersects, having thus far constructed twenty-four
of such grade crossings.

The appellant contends that the crossing at this point
should be overhead, while the appellee contends that such
crossing for a belt line road in competition with the other
roads of the city, all having crossings at grade, should
also be at grade; that as Forest boulevard is located half
a mile south of and parallel with the line of the Vandalia
road, if an overhead crossing is to be constructed for these
railroads the southern approach would necessarily com-
mence at Forest boulevard, and the grade of the southern

approach would have to be one and one-fourth per cent and the approach to the northward would necessarily have to be at least a one per cent grade, and that the expense of construction of such an overhead crossing would be $161,370, its annual expense for maintenance and depreciation would amount to $9124.50, and that such a grade as above stated for an industrial freight belt road would make it practically impossible to compete with the other roads at grade; that an overhead crossing with a grade approach not greater than three per cent (the highest practical grade counsel claim for the appellee's road at that point so as to be able to compete with the other belt roads) would cost $726,420.70; that the annual maintenance of such an overhead crossing would amount to $39,858.70, which, capitalized at five per cent, would make the capitalized investment $1,523,594; that the proposed grade crossing authorized by the decision of the commission and approved by the judgment of the circuit court, including the raising of the road-bed of the Vandalia Railroad Company to bring it to the level of the Baltimore and Ohio Southwestern railroad, and not increasing the grade of the Vandalia railroad at that point, would cost $84,775, and the annual expense for maintenance and operation would be $8778.75. Appellee introduced evidence tending to support its contentions as to these items. The evidence of appellant tended to show that the belt line railroad could profitably compete and operate at a one and one-fourth per cent grade for overhead crossing at this point; that such overhead crossing built at that grade would cost $126,093 and the annual charge for its maintenance would be $7560, and that the cost of raising the grade of the other track the two feet required by the commission's order would be $14,000. Appellee claims the cost of raising such grade would be only about $6000.

The evidence of the appellant shows that it has about forty-two trains daily passing over its tracks at the point of this proposed crossing, nineteen of them being passen-

ger trains, carrying approximately 375,122 passengers per year; that much live stock is shipped over that line for the markets and stock yards at East St. Louis; that appellant has two very fast special mail trains running between New York City and St. Louis; that East St. Louis is largely a manufacturing city and produces much smoke, which interferes with the safe operation of trains and crossings; that fog frequently rises over that section surrounding the point in question, making the grade crossings more than ordinarily dangerous and causing delays to the operation of trains; that there are about thirty railroads entering East St. Louis; that appellee proposes an outer belt line for the purpose of developing a large industrial district which has no switching facilities and for the interchange of freight among the roads entering the East St. Louis district; that the proposition is to build one interlocking plant for both crossings, which will make it more dangerous than if operated singly, and still more dangerous because the two roads, the Vandalia and the Baltimore and Ohio Southwestern, are so close together; that a grade crossing will necessarily impede travel and transportation on appellant's railroad.

The decision and order of the Public Utilities Commission, approved by the judgment of the circuit court, are to the effect that the appellee railroad be authorized to cross at grade said Vandalia railroad, said right of way first having been obtained in accordance with the Eminent Domain act or otherwise, and that before crossing said railroad the appellee shall install an interlocking plant of approved design at said crossing, plans to be prepared and submitted to the appellant railroad company for its examination and to the Public Utilities Commission for examination and approval before the same is installed, the said plant to be installed under the direction and approval of the said commission; that said appellee railroad shall bear the entire expense of the construction, installation and

maintenance of such crossing and interlocking plant on said Vandalia railroad; that the Vandalia Railroad Company be ordered, after agreement with appellee or after said appellee has complied with all the requirements of the Eminent Domain act, to raise its grade at the point of such crossing by an amount of approximately two feet, and to make all other changes that are reasonably necessary to permit the Alton and Southern Railroad to cross the Vandalia railroad at grade at the point proposed. The exact character of these changes, together with the exact amount of the proposed rise, the rate of grade of the approaches, and other details, are to be determined by agreement between the two roads, if possible, and if not possible, then by the commission after another hearing.

Counsel for the appellant argue that the Public Utilities Commission has no power to order the Vandalia Railroad Company to raise its grade in order to enable the Alton and Southern Railroad to cross its tracks at grade; that the statutes only confer upon the commission the right to give or withhold its permission as to the place and manner of the railroads crossing each other, and the authority does not include the right to compel one to raise its grade in order to permit the other to cross at grade; that the statutes under which the State commission is authorized to act must be strictly construed with reference to the powers conferred upon such commission.

Construing a statute strictly means, under the authorities, simply that it should be confined to such subjects or applications as are obviously within its terms and purposes. (2 Lewis' Sutherland on Stat. Const.—2d ed.—secs. 518, 519.) In recent years the rule of strict construction has lost much of its force, as it has become more and more generally recognized "that the paramount duty of the judicial interpreter is to put upon the language of the legislature, honestly and faithfully, its plain and rational meaning and to promote its object." (Endlich on Interpretation of

Statutes, sec. 329.) The intention of the legislature is the law. This intention is to be gathered from the necessity or reason of the enactment, with the meaning of the words enlarged or restricted according to their real intent. In determining the meaning of a statute the courts will keep in mind the circumstances surrounding its enactment and the objects sought to be obtained by the statute. *Hoyne* v. *Danisch,* 264 Ill. 467; *Warner* v. *King,* 267 id. 82.

Section 58 of the Public Utilities act contains some of the main provisions as to the authority of said commission to control grade crossings of railroads. That section provides, among other things, that no track of any railroad company shall "be constructed across the track of any other railroad or street railroad company at grade * * * without having first secured the permission of the commission. * * * The commission shall have the right to refuse its permission or to grant it upon such terms and conditions as it may prescribe. The commission shall have power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use and protection of each such grade crossing." (Laws of 1913, p. 489.) The section further provides that the commission shall have the power to alter or abolish any grade crossing and require a separation of grades at a crossing when it deems the public safety so requires, and concludes with the proviso that the Public Utilities act shall not repeal the Crossing act, approved May 25, 1907, in force July 1, 1907. That act was an amendment re-writing an act of May 27, 1889, and among other things provides that a railroad desiring to cross another railroad shall, before constructing the crossing, apply to the Railroad and Warehouse Commission, and after a hearing that commission shall give a decision "prescribing the place where and the manner in which the said crossing shall be made, but in all cases the compensation to be paid for property actually required for the crossing and all damages .

resulting therefrom, shall be determined in the manner pro-
vided by law in case the parties fail to agree: *Provided,*
that said commission shall only grant permission to con-
struct such crossing at such place and in such manner as
will not unnecessarily impede or endanger the travel or
transportation upon the railroad to be crossed." (Laws of
1907, p. 475.) The Public Utilities act further provides
(section 81) that said act shall not be construed to repeal
any act or part of act (except that of April 13, 1871, in
force July 1, 1871,) conferring power on the Board of
Railroad and Warehouse Commissioners except those in
direct conflict therewith, but the rights, powers and duties
conferred by law upon the Board of Railroad and Ware-
house Commissioners shall be continued in full force and
transferred to the State Public Utilities Commission. The
Railroad and Warehouse Commission act, approved and in
force March 1, 1872, and as thereafter amended with ref-
erence to the incorporation of railroad companies, provides,
among other things, for the obtaining of a right of way
by railroad companies by eminent domain proceedings, and
the sixth clause of section 19 of said act provides that
among the powers that every such corporation shall have,
shall be the right "to cross, intersect, join and unite its
railways with any other railway before constructed, at any
point in its route, * * * and if the two corporations
cannot agree upon the amount of compensation to be made
therefor, or the points and manner of such crossings and
connections, the same shall be ascertained and determined
in manner prescribed by law." (Hurd's Stat. 1913, p.
1942.) This court has held, when two corporations can
not agree upon the amount of compensation or the points
and manner of crossing, that the provision of said section
that the same shall be ascertained in manner prescribed by
law means a proceeding under the Eminent Domain act.
*Chicago and Western Indiana Railroad Co.* v. *Illinois Cen-
tral Railroad Co.* 113 Ill. 156.

Counsel for appellant argue that under the law as it now exists, when a grade crossing requires the raising of the grade of the old railroad, this can only be done and the compensation ascertained by condemnation proceedings; that the Public Utilities Commission has no power to require the raising of the grade of the old railroad in order to permit a grade crossing.   With this we cannot agree.   The difficulties of securing a proper grade crossing under the old method, by condemnation proceedings, were so great that the legislature in 1889 passed the Crossing act heretofore referred to and thereafter amended it in May, 1907.   The plain purpose of the Crossing act as originally passed and as amended was to give the Railroad and Warehouse Commission the authority to control such grade crossings of railroads and to fix the terms and conditions upon which the crossings should be made.   As already stated, the Public Utilities Commission has the same power under said Crossing act as had the Railroad and Warehouse Commission.   In addition to the power granted by the Crossing act, the Public Utilities Commission has enlarged powers under section 58, already quoted from.

Counsel concede that the commission has the power to alter or abolish grade crossings or to require a separation of the grades and specify the terms upon which such separation shall be made, but they contend that the power given to "determine and prescribe the manner of crossing" only means as to the strip of land taken and condemned for the crossing, and cannot mean the authority to go beyond that, or to take a part of the right of way of a road not crossed or actually included in the part taken.   To so hold would be to give the words "the manner of crossing" a restricted, unnatural and unreasonable meaning.   Lexicographers give to the word "manner" a broader meaning than to "method."   "Manner" is literally the handling of a thing and includes both method and mode.   (19 Am. & Eng. Ency. of Law,—2d ed.—918; 26 Cyc. 516.)   The

word "manner," in a statute providing that a railroad may agree with the public authorities as to the manner, terms and conditions upon which a railroad may occupy a highway, means the method or mode of laying the tracks. The word "manner" in a street improvement contract, as to directing the manner in which the work shall be done, means the power to control the work, not only as to its character, but as to the means to be used in doing it. (5 Words and Phrases, 4334, and cases cited.) It has been held under a somewhat similar statute, that a State corporation commission has the right to fix the place of the crossing of railway tracks and the physical construction and arrangement of the crossing. (*Newport News Railway and Electric Co.* v. *Hampton Roads Railway Co.* 102 Va. 847.) Where a crossing cannot be made otherwise than at grade, it will not be denied because it will necessitate the raising of spur tracks of the company crossed eighteen inches, it appearing that the new grade is necessary because of another crossing. 3 Elliott on Railroads, (2d ed.) sec. 1122; see, also, *Butte and A. P. Railway Co.* v. *Montana Union Railway Co.* 31 L. R. A. 298.

Hardly any grade crossing can be made without changing at the point of crossing, in a slight degree at least, the actual grade of the old railroad right of way to be crossed. It would be impossible to have a grade crossing over the appellant railroad and the Baltimore and Ohio Southwestern railroad here in question unless the grade of one of said two roads were elevated or depressed. The evidence shows, without contradiction, that the expense of lowering the grade of a road is much greater than that of elevating the grade. If the argument of counsel for appellant be sustained, the appellee here has the right to commence condemnation proceedings to cross these two roads at this point at such a grade and with such approaches as it desires, being required only to present its plans for the grade crossing in the condemnation proceeding, of course paying

the damages for such crossing that the law requires to the appellant railroad company. Under the law as it now exists these same damages must be paid, but the plans and specifications for such grade crossing must be submitted to and approved by the Public Utilities Commission before compensation can be ascertained in eminent domain proceedings, and also must be submitted to and approved by such commission before a grade crossing can be put in by agreement of the railroads affected by said crossing.

Section 14 of article 11 of the constitution of 1870 provides that the exercise of the power of eminent domain shall never be so construed or abridged "as to prevent the taking, by the General Assembly, of the property and franchises of incorporated companies already organized, and subjecting them to the public necessity the same as of individuals." Every railroad corporation takes its right of way subject to the right of the public to have other railroads constructed across its track whenever the public necessity may be thought to demand it, otherwise the grant of the privilege to construct a railroad across or through the State would be an obstacle in the way of its future prosperity. (*Chicago and Alton Railroad Co.* v. *Joliet, Lockport and Aurora Railway Co.* 105 Ill. 388.) Every railroad accepts its charter and franchises subject to the power of the State to authorize the construction of other roads. The right of one railroad to cross another is essential to its construction. The legislature has the authority to require such conditions and terms as may be reasonable and fair to all the parties, if it provides that the road being crossed shall obtain just compensation for its property thus appropriated. The legislature could not be deprived of this power without a change in the constitution. While the legislature cannot delegate its power to make a law, it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. (*Fish* v. *McGann,* 205

Ill. 179.)    To hold that whatever the legislature may do
it shall do in every detail or else the thing shall go undone
would be to practically destroy government.    Necessarily,
regarding many things, especially affecting local or indi-
vidual interests, the legislature may act either mediately or
immediately.    While the legislature cannot divest itself
of its proper function or delegate its legislative authority,
it may still designate others to do those things which it
can appropriately, yet cannot understandingly or advan-
tageously, do itself.    (*People* v. *Reynolds,* 5 Gilm. 1; *Peo-
ple* v. *Grand Trunk Western Railway Co.* 232 Ill. 292;
*Arms* v. *Ayer,* 192 id. 601; *Block* v. *City of Chicago,* 239
id. 251.)    Under the authorities the mode and manner
of the regulation of railroad or highway crossings in this
State are clearly a matter of legislative discretion.    Such
regulation may be by legislative action directly or may be
exercised through boards or commissions or like bodies,
such as the Railroad and Warehouse Commission or Pub-
lic Utilities Commission.    (*Railroad Commission cases,*
116 U. S. 307; *Charlotte Railroad Co.* v. *Gibbes,* 142 id.
386; *Inter-State Commerce Commission* v. *Brimson,* 154
id. 447; *State* v. *Railroad Commission,* (Wis.) 121 N. W.
Rep. 919.)    This court, in effect, decided that the legis-
lature could delegate such powers as were exercised in this
case by the Public Utilities Commission, in passing on the
authority of the Railroad and Warehouse Commission in
*Chicago and Southern Traction Co.* v. *Illinois Central Rail-
road Co.* 246 Ill. 146.

The legislature clearly intended by said Crossing act of
1889, as amended in 1907, to give the Railroad and Ware-
house Commission authority to regulate, oversee, control
and fix the conditions as to just such crossings as we are
here considering.    If there is any doubt as to the meaning
of those acts, there can be no doubt as to their meaning
in connection with the provisions of said Public Utilities
act.    There can be no escape from the conclusion that the

legislature intended by these various statutes to give the Public Utilities Commission full power and authority over the method, manner and mode of grade or elevated crossings of steam railroads, as well as other railroads and public highways, and to fix the location and prescribe all the conditions as to the physical construction and arrangement of the crossings. This necessarily includes the power to elevate or depress the grade of any existing railroad, if that is the most reasonable method of constructing the crossing in question.

Counsel for appellant further argue that the decision of the Public Utilities Commission, as approved by the judgment of the circuit court, is the taking of their client's property without due process of law, because it, in effect, allows the property to be taken without compensation being paid therefor. In this they are in error. What we have already said indicates clearly that before the property can actually be occupied appellee must either agree with appellant as to the damages for the crossing, or must in eminent domain proceedings settle the amount of compensation it is legally required to pay for the taking of this crossing under the proposed plan. The order of the commission so provides.

Counsel for appellant further argue that even though the Public Utilities Commission can, under certain circumstances, permit a grade crossing where it may require the elevation of the grade of the older road, it has no right or authority to permit the grade crossing provided for in its order in this case, because such crossing will unnecessarily impede the travel and transportation on appellant's road; that the public policy of this and other States, as shown by statutes and by the decisions of the courts, is opposed to grade crossings; that the question whether a crossing other than at grade should be established must be determined mainly on the basis of whether it is physically practicable to have a crossing other than at grade; that a

268 – 6

grade crossing cannot be lawfully constructed if an overhead crossing is practicable. Many authorities are cited by counsel to support these various contentions. While some of them tend to support the argument of counsel, those cases cannot be controlling in this State, as we are acting under a statute differently worded from the statutes construed in those decisions. The necessity and practicability of grade crossings have been amply demonstrated by experience. They are found everywhere, both on railways constructed for purely industrial purposes and also on the great through transportation lines of the country, and it appears from this record that they are operated with reasonable safety and rapidity. Great sums of money are being spent annually in putting in derailing switches, electric bells and other safeguards connected with interlocking grade switch-plants and in the payment of employees who have charge of them. Grade crossings are found in the great cities with their crowded population as well as in the sparsely settled communities of the country districts. While they are discriminated against in some States, so far as we are advised they are nowhere prohibited. "Of such infinite variety are the topographical, financial, commercial, operative and other considerations involved, that the possibility of railroad construction and operation without them has not yet been demonstrated." *Wellsburg and S. L. Railroad Co.* v. *Panhandle Traction Co.* 48 S. E. Rep. (W. Va.) 746.

Counsel argue that the safety of the public, as shown by this record, absolutely requires the construction of an overhead structure at the point in question rather than a grade crossing with an interlocking plant; that the expert testimony in this record is practically in accord that the construction of an overhead crossing would eliminate the dangers incident to an interlocked grade crossing. We are disposed to agree with the argument of counsel that the weight of the testimony in the record is to the effect that

the construction of an overhead crossing eliminates the dangers incident to a grade crossing, however well guarded or protected. There is, however, evidence in the record given by experienced railroad men to the effect that a grade crossing can be made operable and safe by proper mechanical devices and interlocking plants. At least one witness testifies that the question of an overhead crossing taking care of the danger better than an interlocking plant at a grade crossing is a matter of personal opinion; that in the opinion of the witness a grade crossing properly guarded by mechanical devices and regulations is as safe as an overhead crossing. We think the deduction can be fairly drawn from the evidence that grade crossings, properly protected by up-to-date interlocking devices and properly guarded and regulated, are considered by experienced railroad men as reasonably safe and reliable. The testimony tends strongly to show that primarily track elevations in the cities are for the separation of the grades of railroads from the streets or public highways for team and foot passenger travel and not for the separation of the grades of the crossings of the railroads among themselves; that in Chicago and other large cities where railroads have been elevated, the main tracks of the various railroads, in the majority of cases, cross each other at the same grade.

Counsel for appellant mainly rely in support of their argument that the public policy of this State is against grade crossings, on the provision of said Railroad Crossing act of May 25, 1907, heretofore quoted, which states that said Railroad and Warehouse Commission "shall only grant permission to construct such crossing at such place and in such manner as will not unnecessarily impede or endanger the travel or transportation upon the railroad to be crossed." "Unnecessarily" is defined by lexicographers as "without necessity," "needlessly," "uselessly." The legislature, in the passage of these various acts, manifestly never intended that all grade crossings should be abolished

or that all danger at grade crossings must necessarily be eliminated. Railroad travel in any form, at any place, can not be carried on without some element of danger. What was intended by the legislature was to prevent railroad crossings being so constructed as to needlessly, uselessly or without necessity impede or endanger travel or transportation of the railroads crossed. Had it been the intention of the legislature to abolish grade crossings it could have so provided in plain, unambiguous language. This was not done by these various legislative acts to which we have referred but a tribunal was designated to pass upon each case as it arose. From the wording of said statute of May, 1907, it necessarily follows that the legislature contemplated that there would be cases where grade crossings would be proper. That the legislature had the same intention in passing the Public Utilities act is also obvious from the wording of section 58 of that act, wherein it provides that the commission "shall have power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use and protection of each such grade crossing," giving authority to said commission to grant permission for grade crossings, or to abolish, alter or change them.

Beyond question, the authority to decide whether or not there shall be a grade crossing at a certain point rests with the Public Utilities Commission. Section 68 of the act provides that on the hearing in court when an appeal is taken no new or additional evidence may be introduced, "but the appeal shall be heard on the record of the commission as certified to by it. The findings and conclusions of the commission on questions of fact shall be held *prima facie* to be true and as found by the commission; and a rule, regulation, order or decision of the commission shall not be set aside unless it clearly appears that the finding of the commission was against the manifest weight of the evidence presented to or before the commission, * * *

and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions."

The evidence shows, beyond contradiction, that an underground crossing at this point is impossible on account of the soil and water conditions, the land being very flat and not much higher than the ordinary level of the Mississippi river. The order of the commission found that the evidence, as a whole, tended to prove that it was possible to operate a belt line with an overhead crossing at this point but that such crossing was not practicable; that one of the principal purposes for which the appellee's road was being built was to furnish terminal facilities and shipping facilities to large industries along this line, and that this could not be done at this time and in the vicinity of the proposed crossing if the appellee were required to build an overhead crossing at this point; that an interlocked grade crossing would not unnecessarily impede travel or transportation upon the appellant's railroad; that to require an overhead crossing to be constructed by appellee at this point while permitting the other belt lines in East St. Louis to have grade crossings would be, in effect, prescribing different rules for appellee from those being enforced as to other roads of like character; that in determining whether a grade or overhead crossing should be constructed at any point not only the present but the future must be considered; that at some future time the grades of the railroads in East St. Louis may have to be separated from the street grades; that in the future the circumstances may require appellee's track to be carried over the appellant railroad and the Baltimore and Ohio Southwestern railroad, or to be carried under those roads or to cross them at the same grade; that in deciding upon the question of grade crossings and overhead and underground crossings for this city in the future, the interests of everyone will be best taken care of by an orderly and comprehensive plan of construc-

tion at that time, rather than by the construction, from time to time, of scattered and unrelated overhead crossings. We think this finding of the commission is fairly supported by the weight of the testimony in this record. The question as to whether there should be an overhead crossing in any given case must depend largely on the circumstances of that case. A conclusion in each case must be drawn from a variety of facts and circumstances. The location and surroundings of the proposed crossing, the character of the railroads, the use made and intended to be made of them, the increased cost of construction and expense of operation, public safety and convenience, the interests and convenience of the road intended to be crossed, are some of the numerous factors that might enter into the decision of the question of the reasonableness or practicability of an overhead, sub-grade or grade crossing in every case. There is necessarily a material difference between a belt line road carrying no passengers but only freight, and built only for the purpose of connection with the main arteries of traffic entering a city, and a road where the transportation of passengers and through freight is the principal line of work. The evidence is conclusive that the appellee's railroad is being built as a belt line, and tends to show that the growth of population, the extension of appellant's railroad yards and the consequent changes in the city will so alter the character of this portion of appellant's road that it cannot continue to operate this line at this point as a high-speed track even though this grade crossing is not permitted.

Under the evidence in this record and on principle and authority the judgment of the circuit court of Sangamon county must be affirmed.    *Judgment affirmed.*