STATE OF IOWA, Appellant, v. EDWIN C. MANNING, Appellee.

STATE OF IOWA, Appellant, v. W. L. DISBROW, Appellee.

STATE OF IOWA, Appellant, v. JOHN L. DAVIES, Appellee.

No. 42641.

526

MARCH 23, 1935.

REHEARING DENIED DECEMBER 19, 1935.

Edward L. O'Connor, Attorney General, E. J. Grier, County Attorney, J. R. Jaques, Special Assistant Attorney General, and Joe N. Wagner, for appellant.

Merrill C. Gilmore, R. R. Ramsell, City Solicitor, L. L. Duke, Burn Bannister, and Carl Davies, for appellees.

HAMILTON, J.—The pleadings, evidence, and exhibits in this case are quite voluminous, and it will serve no useful purpose and would be impractical to attempt, except in a general way, to incorporate the same in this opinion. There were three separate and distinct actions in equity brought against Edwin C. Manning as mayor, W. L. Disbrow as commissioner, and John L. Davies as commissioner, respectively, of the city of Ottumwa, Iowa, asking for the removal from office of each of said officials for alleged willful and habitual neglect, maladministration, and corruption in office, and alleged failure to observe the provisions of section 388 of the 1931 Code of Iowa with reference to the transfer of funds, in that they did not obtain the approval of the budget director, details of which are set forth in the petition covering 89 pages of printed matter. The answer is a general denial, except for such statements and allegations as are admitted or explained, and specifically denies that said officials were guilty of willful neglect, misconduct, maladministration, or corruption in office, and denies the various specific allegations of the petition, and sets forth alleged facts by way of justification, explanation, and refutation of the particular acts and conduct set forth in the petition, which it is alleged in the petition constituted grounds for removal from office. Said answer also attacks the constitutionality of sections 388 and 390 of the Code of 1931 as being in violation of the provisions of section 6 of article I and section 1 of article III of the Constitution of the State of Iowa.

The cases were heard by agreement of parties on the same evidence in so far as applicable, and submitted on the same evidence and pleadings in the cases. The pleadings were practically

identical in all three cases and were combined for submission to this court, and are herein considered accordingly.

No question was raised as to the fact that the defendants occupied the official positions alleged. The issues raised by the pleadings in a general way involve the question of the guilt of the defendants of the alleged misconduct, maladministration, or corruption in office, and/or habitual neglect or refusal to perform their official duties under section 1091 of the Code, and whether or not they have been guilty of a violation of section 388 of the Code, relative to transfer of funds, and, if so, whether or not, under section 390 of the Code, such violation constitutes a sufficient ground for removal from office, and likewise involve the constitutionality of said sections 388 and 390 of the Code.

We have carefully examined the record and considered the particular propositions pointed out and urged by both appellant and appellees in arguments, both written and oral, and on the question of alleged misconduct, maladministration, and corruption in office, we are constrained to hold that while there are many acts which were irregular and a number of which are specifically prohibited by statute, substantially as alleged in plaintiff's petition, yet in view of the prior pronouncements of this court in the cases of State v. Roth, 162 Iowa 638, 144 N. W. 339, 50 L. R. A. (N. S.) 841; State v. Zeigler, 199 Iowa 392, 202 N. W. 94; and State v. Naumann, 213 Iowa 418, 239 N. W. 93, 81 A. L. R. 483, requiring that all such acts, whether of omission or commission, in order to constitute grounds for removal must have been done knowingly, willfully, and with an evil or corrupt motive and purpose, we do not believe the cause for removal upon these grounds was proven with that degree of certainty which the law demands. The primary purpose of the law, as contained in section 1091 of the Code of 1931, is to protect the public interest. The rules governing are fully discussed and set forth by this court in State v. Meek, 148 Iowa 671, 127 N. W. 1023, 31 L. R. A. (N. S.) 566, Ann. Cas. 1912C, 1075. While we cannot place our stamp of approval upon the manner and method pursued by these defendants in the management of the affairs of the municipality, and are in no way excusing acts and conduct which amount to actual violation of statutory laws, yet we can discern no purpose, on the part of said officials in what they did, to harm, or which was inimical to the interests of such city. No corrupt or evil design or purpose is manifest from the evidence,

with that degree of certainty required by our prior holdings, and in this respect we think the findings of the lower court are correct.

■■■ We are likewise in accord with the findings of the trial court to the effect that the evidence is clear and convincing that the mayor and commissioners knowingly and intentionally paid various city expenses out of funds which were not allocated to or levied for such purposes, and that such appropriation, payments, and transfer of funds were made without a compliance with section 388 of the 1931 Code of Iowa, and that by reason of Code, section 390, the defendants are subject to removal from office unless said section 388 is unconstitutional, as claimed by the defendants, appellees herein.

■■■ This leaves nothing further in this case for our consideration except the question of the constitutionality of said sections 388 and 390 of the Code, and our attention will therefore now be directed to the consideration of this question.

The exact wording of the statute is as follows:

"Transfer of active funds. Upon the approval of the director, it shall be lawful to make temporary or permanent transfers of money from one fund of the municipality to another fund thereof. The certifying board or levying board, as the case may be, shall provide that money temporarily transferred shall be returned to the fund from which it was transferred within such time and upon such conditions as the director shall determine, provided that it shall not be necessary to return to the emergency fund, or to any other fund no longer required, any money transferred therefrom to any other fund." Section 388.

"Violations. Failure on the part of any public official to perform any of the duties prescribed in this and the five preceding chapters shall constitute a misdemeanor, and shall be sufficient ground for removal from office." Section 390.

This law was attacked on two grounds: First, it sets up no standard of conduct to guide the budget director in passing judgment or in making his decision with reference to the transfer of funds, and therefore it is an attempt to delegate legislative power to an executive official, which is an infringement upon the provisions of the constitution, which provides that the legislative power is vested in the general assembly; and, second, it violates the doctrine of uniformity of laws, in that it leaves to the whim

and arbitrary decision of the director to apply one rule in one municipality and another rule in another.

In approaching this question we are impressed with the grave responsibility resting upon the court in dealing with the provisions of the fundamental law of this state, and with the duty of the court in seeing that its provisions remain inviolate. In the first place, we are confronted with the rule of construction of legislative acts laid down by our court that: "There is no presumption against the validity of an act of the legislature. On the contrary, all presumptions are in its favor, and a statute will not be held unconstitutional unless its contravention of constitutional guaranties is so clear, plain, and palpable as to leave no reasonable doubt on the subject; and where the language is reasonably susceptible of different meanings, the courts will lean to that construction which is consistent with its validity." City of Des Moines v. Manhattan Oil Company, 193 Iowa 1096, at page 1117, 184 N. W. 823, 832, 188 N. W. 921, 23 A. L. R. 1322; State v. Hutchinson Ice Cream Co., 168 Iowa 1, 147 N. W. 195, L. R. A. 1917B, 198; Barr v. Cardell, 173 Iowa 18, 155 N. W. 312; McGuire v. Chicago B. & Q. R. Co., 131 Iowa 340, 108 N. W. 902, 33 L. R. A. (N. S.) 706; State v. United States Express Company, 164 Iowa 112, 145 N. W. 451; Brady v. Mattern, 125 Iowa 158, 100 N. W. 358, 106 Am. St. Rep. 291; Rodemacher v. Milwaukee & St. P. Ry. Co., 41 Iowa 297, 20 Am. Rep. 592.

■■■ The three branches, executive, judicial, and legislative, are co-ordinate parts of our government, and the line of demarcation between the three in matters of the character here involved is not easily defined according to any fixed standard of interpretation. As early as the year 1825, no less renowned authority than Chief Justice Marshall, in recognition of this difficulty under such circumstances as confront us in this case, said:

"The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions, to fill up the details." Wayman v. Southard, 10 Wheat. 1, 41, 6 L. Ed. 253.

Our own court has given expression to the same thought in

McLeland v. Marshall County, 199 Iowa 1232, at page 1238, 201 N. W. 401, 403, 203 N. W. 1:

"The exact line of demarcation between legislative power and administrative duties in some cases is not easily determinable. It may be stated, in a general way, that it is for the Legislature to determine what the law shall be, to create rights and duties, and provide a rule of conduct. This does not necessarily mean that the legislature must lay down a strict rule that must be followed by an administrative officer, but that an executive or commission may be vested by the legislative branch of the government with discretion, within certain limits, in carrying out the provisions of a statute."

Likewise, in In re Appeal of Beasley Brothers, 206 Iowa 229, at page 233, 220 N. W. 306, 308, we again said:

"In the nature of things, there is no high wall or definite line of demarcation between the different governmental departments. Necessarily they gradually merge and blend into each other. Administrative officials must on numerous occasions in practice (subject to review by the courts) act judicially. Occasionally administrative functions * * * must be exercised by courts. But, in the main, the three classes of governmental powers are separate and distinct."

In discussing this question the Supreme Court of the United States, in the case of United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 483, 55 L. Ed. 563, at page 568, said:

"From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations,—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions *power to fill up the details* by the establishment of administrative rules and regulations." (Italics ours.)

And again in the case of Marshall Field & Co. v. Clark, 143 U. S. 649, 12 S. Ct. 495, 505, 36 L. Ed. 294, 310, that court said:

"The legislature cannot delegate its power to make a law,

but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, *and must therefore be a subject of inquiry and determination outside of the halls of legislation.*" (Italics ours.)

That the lawmaking body, to wit, the legislature, cannot delegate legislative power, is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by our State Constitution, but the authority to make administrative rules is not a delegation of legislative power. This rule is quoted with approval in the case of McLeland v. Marshall County, 199 Iowa 1232, at page 1239, 201 N. W. 401, 404, 203 N. W. 1. There our court quotes with approval from an Illinois case, Alton & Southern R. Co. v. Vandalia R. Co., 268 Ill. 68, 108 N. E. 800, this language:

"To hold that whatever the legislature may do it shall do in every detail, or else the thing shall go undone, would be to practically destroy government. Necessarily, regarding many things, especially affecting local or individual interests, the legislature may act either mediately or immediately. While the legislature cannot divest itself of its proper function or delegate its legislative authority, *it may still designate others to do those things which it can appropriately, yet cannot understandingly or advantageously, do itself.*" (Italic ours.)

This power of the legislature to delegate to some other agency the working out of the details of carrying out and administering the will of the legislature expressed by the statute has, of necessity, become more and more a rule of interpretation, because of the complexities of business, governmental and economic existence. More and more, the legislature has been driven, by the very nature of things, to discover some means or method of delegating to commissions or agencies the power of carrying out and working out the details, executive and administrative, of laws which contain the express will of the legislature, but which, in order to be effectively enforced, require investigation and expert, scientific knowledge and equipment

to adequately handle the problems of administrative or executive detail. This applies to questions which have grown so cumbersome and involve details so variable that it would be impossible for the legislature to lay down a fixed standard of conduct which would be applicable to each and every problem which might arise. This is quite well illustrated in the necessity which brought forth in this state what is known as our Budget Law (Acts 1924, Ex. Sess., ch. 4, as amended [Code 1931, section 309 et seq.]).

Prior to the enactment of this law, the statutory provisions, with reference to appropriations and expenditures in connection with the various departments of state and local government, and the means and methods of raising revenue for the support and maintenance of our state institutions, were scattered throughout the compiled Code, and contained so many different laws, regulations, and provisions that it was practically impossible for a member of the legislature to adequately comprehend in one session of the legislature, with any degree of certainty, what were or were not the provisions of the multitudinous statutory enactments contained in, and scattered throughout, the Code. This is illustrated in the title to the Budget Act, which requires a half page of fine print to set out the section numbers of the statutory enactments affected by the passage of said act.

In an annotation found in 54 A. L. R. at page 1104, on the "Validity of statute or ordinance vesting discretion in public officials without prescribing a rule of action," the author of this note has compiled, from the holdings of the various courts whose decisions have been investigated, the following:

"In the main, the validity of a grant of discretion depends largely upon the nature of the business or thing with respect to which it is to be exercised, and upon whether or not the proper regulation and control thereof require that a discretion be vested in one or more public officials."

He then sets out in substance the holdings of the courts in reference to matters which require definite rules of action, and on page 1110 of 54 A. L. R., the alternative is set forth, and as a heading to this division of the note the author states:

"As stated in the earlier annotation, *the general rule,* that statutes and ordinances should prescribe a rule of action for

the guidance of any discretionary power conferred upon public officials, is subject to the *qualification that some situations require the vesting of some unguided discretion in public officials, as, for instance, where it is difficult or impracticable to lay down a definite, comprehensive rule."* (Italics ours.)

Here follows a long list of cases in which the courts of the various states, from Maine to California, have recognized this well-known qualification to the general rule, further quotations from which would unduly extend this opinion.

It is quite apparent to the court that the condition which confronted the legislature in the passage of the Budget Act presented a situation which called for an administrative agency, in which it was necessary, to some extent, to vest unguided discretion in supervising and directing the disposition and transfer of funds to meet the complex and varying circumstances and conditions arising throughout the state in the almost numberless municipalities included within the provisions of the act, and that it was absolutely impracticable, if not impossible, to lay down a definite comprehensive rule for the guidance and direction of the budget director that would apply to every condition which might arise. In the first place, it is impossible for the legislature to foresee future events which might affect the financial budget of the various municipalities. Could the legislature have foreseen the unprecedented events which occurred in the illustrious, fertile state of Iowa, in the memorable year of 1934, when the drought and hot winds turned her waving fields of grain and millions of acres of corn into worthless provender, and that the chinch bugs would come in swarms like the locusts of Biblical times, and devour what little there was remaining, thus turning one half of the "tall corn" state into a burning Sahara desert, while in the other half there was plenty and abundance? Could the legislature foresee and lay down rules to cover a condition such as this that never happened in Iowa before in the memory of man—a condition which resulted in the closing of nearly all sources of revenue and required the postponement of tax sales and thus retarded the payment of the ordinary taxes upon which municipalities depend for practically all their revenue? Could these and multiplied instances of events, which we could recite, be foreseen or anticipated by the legislature and a rule or standard fixed by statute

which would adequately cover every varying condition and circumstance for the guidance of the budget director? To attempt to do so would require a code of laws so large that it would necessitate some mechanical device or pack mule to tote it about. No such unreasonable and absurd thing as this was contemplated by the framers of the Constitution, and for the court to so hold would rightly subject it to the disapprobation and ridicule of all fair-minded citizens.

Furthermore, the budget director does not make the law, or rule, the violation of which is made a misdemeanor and furnishes ground for the removal of the officer violating the same. The gist of the offense is the doing of a thing which it is provided by law shall not be done without the director's approval. To withhold his approval is not the making of law. It is an act of administration of the law already on the statute books. The legislature defined what the taxing bodies should do and not do. The budget director lays down no law; he is, along with other administrative bodies, provided by the legislature to determine the manner and methods of handling the municipal, local, county, and state budgets, the raising of money, and the expenditure thereof. He is to be furnished all the estimates and he is provided with expert accountants and is responsible to the Governor and the legislature for his actions, and it is implied that he is to sit as a disinterested and impartial arbiter and supervisor and advise and direct, as his name indicates, and because of this supervisory, administrative power vested in him, and the scientific, expert assistance provided for him, and the information furnished him by each municipality and taxing body within the provisions of the statute, which is on file in his office, the lawmakers require of the municipalities that they permit him to supervise in the transfer of funds and pass upon the feasibility of making or not making such transfers. He makes no laws. He approves or disapproves the proposals of those who act. Each asking on the part of a municipality presents a new situation which calls for his expert advice, supervision, and direction. Surely the legislature, confronted with this situation, can grant to one such supervisory or quasi judicial powers, administrative in their nature, over matters of this kind.

Furthermore, the Budget Act, properly interpreted, contains ample provision for guidance and direction of the budget

director in making his decisions. The entire act must be considered in properly interpreting the provisions embraced in sections 388 and 390 of the Code. The law is contained in six chapters of the 1931 Code (section 309 et seq.). Chapter 19 (section 309 et seq.) contains provisions applicable to all other chapters. It provides for the appointment and removal of the budget director. It provides that the director, with the approval of the executive council, shall employ a state accountant and such assistants and other employees and agents as may be necessary from time to time *to carry into effect the provisions of this and the five following chapters*. It defines his general powers and duties, and the legislature says to him in substance: "You shall have power and it is hereby made your duty to *carry out and enforce all the provisions of this and the five following chapters,* and to conduct hearings on all matters within your jurisdiction and render decisions thereon." For this purpose the director is given power to subpoena witnesses and compel their attendance to produce books, letters, documents, papers, statistics, and all other articles *deemed essential to a full understanding of the matter under investigation.* One of these five chapters relates to the local budget (chapter 24, section 368 et seq.) and contains the section of the law under investigation. And while the director is a state appointee under this law, he is, in fact, clothed with powers and duties reaching down into the local municipalities, as broad and effectual as those pertaining to any other local municipal official, and is, in a sense, ex officio a member of the official family of every tax certifying and tax levying body of all local municipality within the state of Iowa, included within the provisions of the Budget Act. This is a matter properly to be considered in construing the Budget Act as applied to local municipalities.

Municipalities are creatures of the legislature. It possesses almost unlimited power and authority with reference to making laws governing municipalities. As said in Eckerson v. City of Des Moines, 137 Iowa 452, at page 465, 115 N. W. 177, 183:

"The Constitution is wholly silent on the subject of the means by which, and the manner in which, local self-government shall be accomplished. From this comes readily the conclusion that there was committed to the general assembly, as part of the legislative authority vested in it, full and plenary

power to select the agencies appropriate in its judgment to the purpose, and to clothe such agencies with powers to be exercised in manner and form as prescribed therefor. Indeed, this must be so. Inherent in the unrestricted authority to organize is the authority to prescribe powers within general constitutional limits, and to designate the officials upon whom shall rest the duty of carrying such powers into execution. Smith on Corp. section 153; Cooley on Const. Lim. p. 133; 20 Am. & Eng. Ency. p. 1223. And all the authorities agree that, in the absence of any constitutional restriction, it is within the province of the legislature to clothe an officer or agency created by it with functions involving the exercise of powers executive, legislative, and judicial in character—one or all. State v. Barker, 116 Iowa 96, 109, 89 N. W. 204, 57 L. R. A. 244, 93 Am. St. Rep. 222. So, also, the universal practice has been that way. As it is well known, the county courts of this state, when they existed, were not only authorized to perform judicial duties, but executive and legislative, as well. Under the general statutes now existing, mayors of cities and towns have conferred upon them powers and duties both executive and judicial, and, particularly in towns, the mayor, in virtue of his right to vote on all questions coming before the council, constitutes in all strictness a part of the corporate legislative body. Boards of supervisors, city and town councils, boards of school directors, township trustees, and various individual officers are directly charged with and are in the performance of powers and duties, now, administrative in character, and again judicial, etc. We shall not stop to further particularize. The statute book of this state, as of every state in the Union, is replete with illustrative examples.''

The local budget law (Code 1931, section 368 et seq.) forbids any municipality which comes within its provisions from levying or certifying in any one year any tax on property unless and until estimates have been made and filed and considered as to: First, the amount of income thereof for the several funds from sources other than taxation; second, the amount proposed to be raised by taxation; third, the amount proposed to be expended in each and every fund and for each and every general purpose during the fiscal year next ensuing; fourth, a comparison of such amounts so proposed to be expended with the amounts

expended for like purposes for the two preceding years, all to be specifically itemized and classified so as to show each particular class of proposed expenditure on forms prescribed by the director, the same to be prepared and filed in time to be examined and a hearing had thereon, at which any one interested may appear and be heard for or against the proposed tax. The amount of difference between the receipts estimated from all sources other than taxation and the estimated expenditures for all purposes, including the estimates for emergency expenditures, shall be the estimated amount to be raised by taxation upon the assessable property within the municipality for the next ensuing fiscal year. After the hearing provided for, the certifying board shall enter of record its decision in the manner and form prescribed by the director and certify the same to the levying board, which board shall enter upon the current assessment and tax roll the amount of the taxes which it finds shall be levied for the ensuing fiscal year in each municipality for which it makes the tax levy. No greater tax shall be levied than that entered on the record for the purpose or purposes indicated and no greater expenditure of public money shall be made for any specific purpose than the amount estimated and appropriated therefor. This local budget of the various municipalities shall be certified in duplicate by the proper board to the county auditor not later than August 15th each year on blanks prescribed by the director and according to rules and instructions which shall be furnished in printed form by him, and one copy shall be sent by the auditor to the budget director.

In these provisions of the Budget Act can plainly be found sufficient standard to guide the director. He is to carry out the purpose of the provisions of the act. He is given full power to conduct hearings as hereinbefore stated. He is furnished these certified records from the auditors' offices, and when any municipality asks for authority to transfer funds, the standard to guide him is found in the statistical report on file in his office from the particular municipality asking for the transfer. The expenditures of the past two years from each fund for the particular purpose for which the tax was levied are there before him for comparison, and enable him to determine the propriety of making the transfer. These reports are required by law to be in accordance with the best methods of accountancy on forms worked out by expert accountants and specialists in taxation

matters. The various reports on forms specified and prescribed by him and required to be filed in his office, and vesting his agency with the power of fact finding, are for the very purpose of giving him a standard and guide in the exercise of his discretion in passing upon the matters which are intrusted to him under the Budget Act, and by which act is imposed upon him the duty of carrying into effect its provisions. For what purpose are all these statutory requirements for observing the best methods of accountancy and statistical statements in making out and keeping the reports of the tax levying and tax certifying bodies, if not to guide the budget director? What other or further or more definite guide or standard could be laid down that would be of any efficacy? The legislature might have said that he should consent to the transfer when in his judgment it would be for the best interests of the taxpayers of the municipality, or when from his examination of the estimates on file as compared with the prior two years, he deemed it expedient or proper, or when in his judgment it could safely be done, or similar general expressions. All this is implied and is inherent in the very nature and purpose of the Budget Act, and the legislature having intrusted the supervisory and directing power in his hand, it certainly can be presumed that in his quasi judicial function, coupled with his administrative, supervisory, and directory powers, he will act in the best interests of the taxpaying public. This thought is embraced within the term "supervision" as used in the statute. To "supervise" is to have general oversight over—to superintend or to inspect—and a director is one who directs. He is an executive, administrative official clothed with some discretionary powers, judicial in character, so that his duties partake of all three branches of government in a limited sense.

Must this court lay down a hard and fast rule of construction of a statute dealing with complex matters of this kind, and thus overthrow the whole budgetary system of our state government, simply because it is urged by counsel as a means of extricating their clients from a hazardous position for acts admittedly done in violation of the express provisions of the statute? This we should not do unless the contraventions of the constitutional guaranties complained of are "so clear, plain, and palpable as to leave no reasonable doubt on the subject." City of Des Moines v. Manhattan Oil Company, supra. We are thus

confronted with a situation which the court should examine with the utmost scrutiny. In the case of Brady v. Mattern, 125 Iowa 158, 100 N. W. 358, 106 Am. St. Rep. 291, the same question was urged against the law involved in that case, namely, that the law delegates legislative powers to the auditor of state and the executive council, thereby violating the same sections of the Constitution upon which appellees rely in this case, and we said on page 169 of 125 Iowa, 100 N. W. 358, 362:

"We find no authorities which hold that the legislature cannot give to executive officers a discretion in determining the conditions to be imposed on the conduct of a business which is subject to legislative control. The legislature can only pass general statutes. It cannot provide for their application to particular conditions. Discretion may be conferred upon a railroad commission to fix rates of fare or freight. * * * The board of supervisors of a county may be given the authority to fix the fees or compensation of officers. * * * We see no reason why the legislature cannot authorize the executive council to determine whether the plan and methods in accordance with which the building and loan business is to be conducted by any particular association are fair, reasonable, and in accordance with public policy, or why the state auditor cannot be authorized to fix the amount of securities which an unincorporated association desiring to conduct such business in the state shall deposit for the security of its members. *It must be assumed that state officers will act fairly and impartially and in accordance with their best judgment, and statutory provisions allowing them to exercise a discretion in such action are not to be condemned as unconstitutional.*"

Chief Justice Taft, referring to the well-known maxim, "Delegata potestas non potest delegari," as applied to the construction of constitutional questions dealing with the three independent branches of government, in the case of J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 406, 48 S. Ct. 348, 351, 72 L. Ed. 624, at page 629, said:

"This is not to say that the three branches are not coordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the

constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.

"The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations. United States v. Grimaud, 220 U. S. 506, 518, 31 S. Ct. 480, 55 L. Ed. 563, 568; Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; Re Kollock, 165 U. S. 526, 17 S. Ct. 444, 41 L. Ed. 813; Oceanic Steam Nav. Co. v. Stranahan, 214 U. S. 320, 29 S. Ct. 671, 53 L. Ed. 1013."

See, also, City of Milwaukee v. State R. Comm., 162 Wis. 127, 155 N. W. 948; 12 A. L. R. 1447, note; Moers v. City of Reading, 21 Pa. 188, 202; State v. Fairmont Creamery Co., 153 Iowa 702, 133 N. W. 895, 42 L. R. A. 821; 12 C. J. 791; Schultz v. Parker, 158 Iowa 42, 139 N. W. 173, Ann. Cas. 1915D, 553; State v. Hutchinson Ice Cream Co., 168 Iowa 1, 147 N. W. 195, L. R. A. 1917B, 198; Loftus v. Department of Agriculture, 211 Iowa 566, 232 N. W. 412; Fevold v. Board of Supervisors, 202 Iowa 1019, 210 N. W. 139; Mutual Film Corporation v. Industrial Commission of Ohio, 236 U. S. 230, 35 S. Ct. 387, 59 L. Ed. 552.

That the Budget Law is uniform in its operation cannot be seriously questioned. All municipalities that come within its provisions are placed on an equality; and that the officer to whom the discretionary power is delegated by the legislature to supervise and direct when, and in what manner funds shall be transferred, is presumed to act fairly and impartially, and that it is within his power to deal unfairly and partially and arbitrarily, does not render the law unconstitutional. If he fails to meet the requirements of the statute with reference to carrying out the very purposes of the act, ample provision is

made in the statute for his removal at once, and the courts are always open to any aggrieved, interested party or municipality. In the very nature of the duties that are to be performed, it would be impossible to fix any standard for the guidance of the director that would work the same in all localities. He must pass on the expediency or necessity and possibilities bearing upon the very question presented in each particular case, and what would be proper in one case might be improper in any other under varying circumstances. For the legislature to attempt to lay down definite rules applicable under all circumstances and conditions would result in a veritable cataclysm of statutory regulations and limitations, which would defeat the very purpose for which the law was enacted.

We therefore hold that sections 388 and 390 of the 1931 Code of Iowa are valid and binding laws, and that same are not unconstitutional. It accordingly follows that the decree of the trial court on this branch of the case is erroneous and should be and is hereby reversed, and in accordance with the findings of facts by the trial court and of this court, the defendants and each of them are guilty of knowingly and intentionally paying various city expenses out of funds which were not allocated to, or levied for, such purposes; that such appropriations, payments, and transfers of funds were made without a compliance with, and in violation of, the provisions of section 388 of the 1931 Code of Iowa; that under and by virtue of the provisions of Code section 390, the defendants and each of them are subject to removal from office for failure to comply with the terms and provisions of said section 388 in the transfer of said funds, in that such transfers were made without the approval of the budget director; and that they and each of them should be removed from their respective offices. In all other respects the decree of the lower court in each of said cases is affirmed. The cases are, therefore, affirmed in part, reversed in part, and remanded, with instructions to prepare decrees in each of said cases accordingly.

Reversed in part, affirmed in part, and remanded with instructions.

ANDERSON, C. J., and KINTZINGER, DONEGAN, PARSONS, and RICHARDS, JJ., concur.

ALBERT, J., concurs in result.

POWERS, J., took no part.

MITCHELL, J., dissents.

MITCHELL, J. (dissenting)—I find myself unable to agree with the majority opinion and therefore respectfully dissent.

In the majority opinion they find that the defendants were not guilty of the acts charged by the state under what is known as section 1091 of the Code. With that I agree. In the majority opinion they hold that what is known as the Budget Law is constitutional. With that I agree. The majority then base their opinion, as I read it, because the record does show there were some transfers of funds, from one fund to another, without the consent of the budget director, upon section 390 of the Code, holding such violation constitutes a sufficient ground for removal from office regardless of why the transfers were made or the motives that caused the public officials to make such transfers. With this I cannot agree.

The particular section of the Code which provides for the removal of officials on the ground of their wrongful doing is section 1091, which provides as follows:

"1091. Removal by court. Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:

"1. For wilful or habitual neglect or refusal to perform the duties of his office.

"2. For wilful misconduct or maladministration in office.

"3. For corruption.

"4. For extortion.

"5. Upon conviction of a felony.

"6. For intoxication, or upon conviction of being intoxicated."

It seem to me that sections 388 and 390 are supplementary to section 1091. These are as follows:

"388. Transfer of active funds. Upon the approval of the director, it shall be lawful to make temporary or permanent transfers of money from one fund of the municipality to another fund thereof. The certifying board or levying board, as the case may be, shall provide that money temporarily transferred

shall be returned to the fund from which it was transferred within such time and upon such conditions as the director shall determine, provided that it shall not be necessary to return to the emergency fund or to any other fund no longer required, any money transferred therefrom to any other fund.''

''390. Violations. Failure on the part of any public official to perform any of the duties prescribed in this and the five preceding chapters shall constitute a misdemeanor, and shall be sufficient ground for removal from office.''

So far as the pleadings and evidence are concerned, the majority rest the opinion upon the alleged violation of section 388. That is to say, that wrongful acts pressed against the defendant were a violation of the duties defined in section 388, in that the defendant and his associates unlawfully transferred money from one fund to another and failed to return the same. Under the majority opinion, as I read it, it is not necessary for the state to prove moral turpitude and evil intent on the part of the defendant and his associates in regard to the doing of the substantive acts complained of. In fact, they admit there is no such showing. The majority say that the violation of section 388 alone is sufficient to oust this defendant and his associates from the offices to which they were duly elected by the people. Reading section 388 as a criminal statute, it is interesting to note that it does not contain a single prohibition, nor does it define any prohibited act. It does provide affirmatively that ''upon the approval of the director, it shall be lawful to make temporary or permanent transfers of money from one fund,'' etc. It further provides affirmatively that the board ''shall provide that money temporarily transferred shall be returned to the fund from which it was transferred'' as soon as it may be. The foregoing language carries an implication that the approval of the director was a prerequisite to the transfer of the fund. This section does definitely impose a duty upon the board to return the transferred moneys to their proper fund. The failure to replenish these depleted funds is the gist of the willful neglect which is charged against the defendant officials. Section 390 should, it seems to me, be read as a part of section 388. This section purports to define a ''misdemeanor''. This definition does not purport to be predicated upon the breach of any duty defined in the section itself. It is not confined in its applica-

tion to section 388. On the contrary, it is made to apply in blanket form to every section contained in the preceding five chapters of the Code. Without going into the question of whether a valid criminal statute may be thus enacted, and admitting the validity of sections 388 and 390 for the purpose of this case, I think we can do so only on the theory that section 390 is in the nature of an addition or amendment to section 1091. Section 1091 and its associated sections comprise the statutory law on the subject of removal from office. A proceeding for any removal from public office must proceed under section 1091 and its associated sections. The procedure followed in this case is that provided in such section.

On the question of whether the state must prove a corrupt intention as a ground for removal from office, section 1091 and its cognates have had frequent interpretation by this court. We have held uniformly that a willfully wrongful act on the part of an official means an act done "with a bad and evil purpose, contrary to known duty". Our latest case is State v. Naumann, 213 Iowa 418, 239 N. W. 93, 81 A. L. R. 483. Our previous cases are there collated, and I will not include them herein. I think it is undisputably settled by our cases referred to in the Naumann case that moral turpitude is an essential element in the proof to be made by the state as a ground for removing a public official. Not only am I of the opinion that such turpitude is not proved in this case, but it seems to me that the majority in their opinion concede that. In fact, the majority hold that such turpitude need not be proved except by the implication that the court may draw from the act of statutory breach itself.

On the question of corrupt intent, a bird's eye view of the case shows that when this defendant became mayor in 1929, what may be termed the working funds of the city were overdrawn to the amount of $45,000. The situation existed, not by choice of any official, but by a practical necessity. The taxpayers were not paying their taxes, except in a very limited degree. It will be noted from section 388 that the only affirmative duty imposed was upon the "levying board" to make provision for the return of transferred funds. This means that the board was to levy taxes. They did levy the taxes. There was no default in that respect. But the taxpayers—for reasons of which this court should take judicial notice, to wit, a great economic depression—failed to pay such taxes except in a limited amount. Strictly

speaking, there was no breach of the statute by the council as a "levying board". I think that no one can fairly read this record and say that under the circumstances surrounding them, the mayor and council were not doing their utmost to make the public resources serve the absolute necessities of the situation. For instance, salaries of policemen became due. The police fund was depleted. It is the claim of the defendant and his associates that money had been transferred, prior to the time they took office, from the general fund to pay the firemen; but, regardless of that fact, there was no place that these public officials could secure this money. The people of Ottumwa had chosen Mr. Manning to be their chief executive, and they were looking to him for action. It was necessary that the police force be maintained. Salaries were paid from another fund by transfer. Could they honestly believe that such a course was in the interest of the city? Can anyone doubt that the transfer was made for the best interests of the city? A sewer was broken. It lay underneath a pavement, and in order to repair it the pavement had to be cut, and after repairing it, the pavement had to be repaired. There was a pavement fund and a sewer fund. Only one of such funds had money, and they paid the bill out of that fund. The prosecution charges that the payment should have been made from the other fund. Assuming the correctness of the prosecution in such contention, did such act indicate moral turpitude or evil intent?

An examination of all of the things with which this defendant and his associates are charged, as set out in the record, convinces me that the state has failed to prove any corrupt act on the part of the defendant and his associates.

This court has heretofore stated its views upon the ousting of a public official. In the case of State v. Meek, reported in 148 Iowa, page 671, at pages 682, and 684, 127 N. W. 1023, 1027, 31 L. R. A. (N. S.) 566, Ann. Cas. 1912C, 1075, Justice Weaver, speaking for the court, said:

"There is no suggestion that appellant is not in every way competent to fill the office and discharge its duties with efficiency. So far as this case reveals, his personal character stands unimpeached, and his official record is without stain or corruption. To say that such an officer is to be removed in disgrace from the office to which he has been elected by the county in

order to vindicate a law, the object of which is as we have said to 'rid the community of corrupt, incapable, and unworthy officials,' is to sanction a shocking injustice. To so hold is to put it in the power of any envious or maliciously inclined person to endanger the incumbency and heap undeserved reproach upon the most capable and conscientious officer in the public service. It is not given to any man to be absolutely perfect in the discharge of all duty. There is no man in official position so letter perfect in the law that he does not at some point by act or omission or misconstruction of the law, though with perfect integrity of motive, fall short of the strict statutory measure of his official duty. That such technical violations against which an ordinary civil action in damages affords a complete remedy should be classed as impeachable offenses calling for the removal of an officer is intolerable. * * *

"The essential inquiry is whether the record shows the appellant conclusively and as a matter of law guilty of such willful misconduct in office that public interests require his removal."

And so in the case at bar there is no suggestion that the defendant—the mayor, and his associates, are not in every way competent to fill the offices to which the people of Ottumwa elected them. No one questions their personal character. The people of Ottumwa elected the defendant and his associates. They have a right under the laws of this state to elect their city officials and have such officers serve out the terms for which they were elected. I have become convinced myself that the trial court properly decided this case on the ground, if no other, that, bad faith was not shown, and I would affirm the judgment of the lower court.